562 P.2d 704
STATE of Arizona, Appellee,

v.

John Henry KNAPP, Appellant.

No. 3106.

Supreme Court of Arizona,
En Banc.

March 9, 1977.

Bruce E. Babbitt, Atty. Gen. by William J. Schafer, III, and Frank T. Galati, Asst. Attys. Gen., Phoenix, for appellee.

Charles C. Diettrich, Phoenix, for appellant.

HAYS, Justice.

John Henry Knapp, appellant, was convicted of two counts of murder in the first degree by a jury on November 19, 1974. He was sentenced to death, on both counts, by the trial judge on January 6, 1975. The review of the judgment and sentence by this court is mandatory pursuant to A.R.S. §§ 13–1711 and 12–120.21(A)(1), and 17 A.R.S. Rules of Criminal Procedure, rule 31.2(b).

## FACTS

On November 16, 1973, there was a fire at the Mesa, Arizona, home of the appel-

lant. He lived there with his wife, Linda Knapp, and his two natural daughters, Linda Louise, three years old, and Iona Marie, two years old. The fire was almost completely confined to the children's bedroom; their bodies were burned beyond recognition.

After completely extinguishing the blaze, one of the firemen at the scene noticed an oily film on top of the water remaining in the bedroom. He called it to the attention of several other firemen at the scene. A complete investigation into the fire's cause was launched, and it was determined that the fire was caused by the use of a flammable liquid accelerant, and was not an ordinary combustible fire.

On November 27, 1973, a coroner's inquest was held and it was there determined that the fire had been purposefully started by some person or persons unknown. It followed that the death of Linda Louise and Iona Marie had resulted from a criminal act, to wit, arson.

The police investigation after the fire had focused immediately on the only other occupants of the Knapp home, the appellant and his wife, Linda. The two were questioned extensively on November 19, 1973, at the Mesa police substation. Although their statements were not inconsistent with each other, nor with statements they had made the day of the fire, they were inconsistent with the way the police and David Dale believed the evidence showed that the fire was ignited. It was on the 19th that both suspects were first read their *Miranda* rights. Appellant signed a card with those rights on it, acknowledging he had been advised thereof.

On November 20, 1973, Linda Knapp left Arizona with her natural father and went to Nebraska where she remained until just before appellant's first trial in August, 1974. Appellant was not advised that Linda was going until after she had left, nor was any explanation given him for her departure.

Between November 20 and 27, appellant, staying at the home of his in-laws because his house had been sealed and secured by the State to preserve evidence, was served with a subpoena to appear at the inquest. A subpoena was left there for Linda Knapp also, but she never received it. Appellant was advised by the officer who delivered the subpoenas, however, that if Linda did not appear for the inquest she was subject to arrest.

Although he appeared for the inquest, appellant was not called to testify. After it was over, he was advised of its conclusions. He immediately approached the justice of the peace who had conducted the inquest and requested that an attorney be appointed to represent him. The request was refused because the justice indicated that he had no authority to appoint counsel until appellant was charged with some crime.

The same evening, while again at the home of his in-laws, both of whom were out for the evening, appellant was approached by several officers of the Maricopa County Sheriff's Department. In charge was Sgt. Robert Malone, who asked appellant if he would accompany them to the Knapp residence for the purpose of re-enacting the events of the morning of the fire as best appellant could recall them. Appellant agreed to go, and was driven there in an unmarked police car by the officers.

Upon their arrival at the Knapp residence, appellant was again advised of his *Miranda* rights. At this point he told Malone of his earlier request to the justice of the peace for appointed counsel and of that judge's refusal. Malone later testified at a voluntariness hearing with regard to this:

DEFENSE COUNSEL: . . . Now wouldn't it be fair to say . . . he was requesting the advice of counsel and was under the mistaken belief he wasn't entitled to it until he had been charged with a crime?

MALONE: The way he and I talked, I would say "no" to your question.

DEFENSE COUNSEL: You think he just mentioned that in idle talk?

MALONE: No, sir, I think he was asking a question.

DEFENSE COUNSEL: . . . Did you explain . . . he was entitled to have counsel appointed right then and there if he wished it, court appointed?

MALONE (referring to a police report): Again, referring to that same paragraph, it says that Sgt. Malone then advised Mr. Knapp if he wanted an attorney we would get one appointed for him immediately. . . .

According to Malone, Knapp replied that he would answer police inquiries, but only those he had personal knowledge of; that is, he could not answer any questions in his wife's behalf.

After going through appellant's story and demonstration again (regarding discovery of the fire) at the Knapp residence, Malone took him back to the Mesa substation for the express purpose of interrogating him further. Malone still wished to clarify some of appellant's statements which remained inconsistent with the way police believed the fire began.

Either on their way to the substation or shortly after their arrival there, the police offered appellant some food, but he refused it. During a questioning period of some three hours there, appellant obtained soft drinks from a machine, unaccompanied, was allowed to use a rest room facility, unaccompanied, and was able to smoke cigarettes as he pleased.

It was pointed out to appellant during this interrogation that the police believed the fire to have been purposefully set, that the children themselves had been excluded (by fingerprint analysis and the fact that no fuel container was found in the room), and that left only appellant and his wife as possible perpetrators. Asked point-blank if his wife was capable of having started this fire, appellant answered she was not. He was then advised that that left him as the only suspect. It was Malone's testimony that, at first, appellant denied starting the fire, but eventually said that it was possible he had done it, but if he did, he didn't remember doing it. At this point, appellant began complaining about spots that were part of the floor tile in the room. It was this incident that precipitated the actual confession.

Officer Malone testified that when appellant began complaining about the spots, Malone placed a solid color chair in front of appellant and told him to look at that instead. Malone then began questioning appellant in the following manner:

MALONE: . . . I asked him if he observed these spots on the day of the fire, and he said that he had, and I asked him if he observed these spots in his house, and he said that he had, and I asked him did you observe these spots in your children's room, and he said that he had, and I asked him did he observe these spots on his children, and he said it was possible.

.　.　.　.　.

PROSECUTOR: So after he claimed he was seeing spots everywhere did he tell you what he did?

MALONE: Yes, sir, he tried to wash the spots away.

.　.　.　.　.

He said that he used water.

PROSECUTOR: Did he tell you what the water was contained in?

MALONE: Yes.

.　.　.　.

It was . . . in a Coleman fuel can.

PROSECUTOR: Did he ever mention . . . where he got the . . . fuel can?

MALONE: Yes. . . .

.　.　.　.

Out of the hall closet.

PROSECUTOR: Did he tell you how he got it and what he did with it afterwards?

MALONE: He said that he went to the hall closet and . . . removed this can, went back down to the room, poured it throughout in an attempt to wash the spots away. . . . I asked him did the spots go away . . . and he said that they did not.

PROSECUTOR: Did he tell you if he attempted to get the spots out by any other means?

MALONE: Yes, sir, he did.

. . . . .

By fire. By lighting it.

After giving this version of what happened, appellant was advised that Malone didn't believe the part of his story about the spots. Appellant then told Malone he had found a letter from Linda to her natural father in Nebraska which asked the father for money so that Linda could leave appellant and go there. Because he loved her and didn't want to lose her, appellant told Malone, and because he felt the loss of their children would bring them closer together, he killed the children. Further, appellant said he was tired of seeing his children hungry and cold, and that now they wouldn't be cold anymore.

At least once prior to or during the interrogation and confession, appellant was crying, pulling his hair out and complaining of a severe headache. He was also offered aspirin at one point during the evening, but refused it, saying he would get prescription medicine for the headache when he returned to the home of his in-laws. It was Malone's testimony that appellant turned his emotions off-and-on during the interrogation, and that although he tried to appear irrational, Malone believed it was an act. Circumstances surrounding the situation bore out Malone's theory. There were spots on all the floors in the building, but it was only during this incident that appellant complained of them. Appellant's emotional outbursts were limited to this period of the evening and during the rest of the time he was calm, cooperative and rational.

The trial judge, after hearing the testimony at the voluntariness hearing, decided the confession was given voluntarily, knowingly and intelligently and allowed its introduction at both the first and second trials of this matter, with the appropriate instructions to the jury.

The first trial resulted in a mistrial due to the inability of the jury to reach a unanimous verdict. The second trial resulted in a guilty verdict on both counts of murder in the first degree. A motion for a new trial was denied. Finding the existence of an aggravating circumstance under A.R.S. § 13–454(E) and no mitigating circumstances, the trial judge sentenced the appellant to death. Found to exist was the aggravating circumstance of § 13–454(E)(6): "The defendant committed the offense in an especially heinous, cruel or depraved manner."

Further facts will be developed which are relevant to each of the issues raised by appellant. Those issues are:

1. Did the second trial violate appellant's constitutional right to be free from double jeopardy?

2. Should appellant's confession have been suppressed?

3. Did the trial court err in appointing an expert to assist in appellant's defense, pursuant to A.R.S. § 13–1673(B), then refusing to allot that expert sufficient state funds to conduct certain tests?

4. Did the trial court err in refusing to allow a Phoenix police detective, Eloy Ysassi, to testify as an expert for the appellant?

5. Is the death penalty cruel and unusual punishment in derogation of the Arizona and United States Constitutions?

6. Was the death penalty improperly imposed in this case?

## DOUBLE JEOPARDY

Appellant's argument on this issue can be easily summarized. The State of Arizona must, in a case such as this, prove guilt beyond a reasonable doubt to a jury of twelve persons, Ariz.Const. art. 2, § 23. At the first trial, the State failed to convince a unanimous jury of twelve of appellant's guilt; therefore, giving the State a second chance to prove appellant's guilt violates appellant's right, under both the Arizona and United States Constitutions, to be free from double jeopardy.

■ The Fifth Amendment to the United States Constitution, in appropriate part, says:

> . . . [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb. . . .

This prohibition applies to the states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). However, since the year 1824 the United States Supreme Court has interpreted this right broadly when a mistrial was properly declared.

> . . . [I]n all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. *United States v. Perez*, 9 Wheaton (22 U.S.) 579, 6 L.Ed. 165 (1824).

*Perez* was a "capital offense" case wherein a jury in the first trial was unable to agree on a verdict and the defendant was later retried. His conviction was affirmed therein.

■ Since we are forbidden to interpret federal constitutional law more strictly than the United States Supreme Court, *Oregon v. Haas*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), we cannot say that appellant's retrial violated his Fifth Amendment right to be free from double jeopardy.

> State law also provides for that right. No person shall . . . be twice put in jeopardy for the same offense. Ariz. Const. art. 2, § 10.

■ It is the law in Arizona, as well as in federal courts, that a defendant may be retried after a trial judge has, even without the defendant's consent, discharged a jury unable to agree on a verdict. *State v. Moore*, 108 Ariz. 532, 502 P.2d 1351 (1972), *cert. denied*, 412 U.S. 906, 93 S.Ct. 2292, 36

L.Ed.2d 971 (1973). The issue is, whether under all the circumstances of the case, the trial judge acted in the exercise of sound discretion in declaring the mistrial. *State v. Moore, supra.* In the absence of a showing of abuse of that discretion, the trial court's ruling will not be disturbed on appeal. *State v. Trotter*, 110 Ariz. 61, 514 P.2d 1249 (1973).

In this case, the jury at the first trial began deliberations on August 30. The evening of August 31 the jury foreman reported that they were hopelessly deadlocked. Because of the length of the trial, however, and the large number of exhibits, the judge asked them to continue to try to reach a verdict. On the evening of September 2, the foreman again reported the jury was still unable to reach a unanimous verdict. It was at this point the mistrial was declared, without opposition from either defense counsel or the prosecutor.

> Legal necessity for the discharge of the jury exists when at the expiration of such time as the court might deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree. [cite omitted] *State v. Marks*, 113 Ariz. 71, 73, 546 P.2d 807, 809 (1976); 17 A.R.S. Rules of Criminal Procedure, rule 22.4(b).

■ Under these circumstances, we cannot say the trial judge abused his discretion in declaring the mistrial. The appellant was not deprived of his right to be free from double jeopardy under the Arizona Constitution or that of the United States.

## THE CONFESSION

Appellant contends his confession should have been suppressed for two reasons: (1) it was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)[1] and (2) it was involuntarily given.

---

1. *Miranda* says, "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S. 436, 443, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

■ We disagree that the confession was obtained in violation of *Miranda*. Appellant was read his rights when he was questioned on November 19 and on the evening he gave his statement. This we know because it was the reading of his rights that prompted the discussion about the justice of the peace and his refusal to appoint counsel. He argues, however, that his remark to the police officer after being read his rights at the scene of the fire, about the justice of the peace's refusal to appoint counsel for him should have been sufficient indication to the police that he wanted an attorney. The trial judge heard, and apparently believed, Officer Malone, who explained that he re-advised the appellant that if he wanted an attorney, one would be obtained for him immediately. Appellant replied then that he would answer questions of which he had personal knowledge, and proceeded, during the rest of the evening to do so. He never again requested, nor even discussed, an attorney. He cooperated completely in answering questions.

■ It is sufficient to advise a suspect that a lawyer will be made available to him prior to questioning if he so desires. It is not necessary for the policeman to tell the suspect he'll go and get him one. *State v. Marks, supra.* Answering questions after the *Miranda* warnings have been properly given constitutes a waiver by conduct. *State v. Pineda,* 110 Ariz. 342, 519 P.2d 41 (1974). It was not unreasonable for the officer to assume, after their discussion, that appellant didn't feel he needed an attorney immediately, and to therefore proceed with questioning. This position of the appellant is untenable.

■ It remains for us to determine whether the trial judge abused his discretion in finding the confession was given voluntarily, knowingly and intelligently. Unless his determination was clear and manifest error, it will not be disturbed on appeal. *State v. Edwards,* 111 Ariz. 357, 529 P.2d 1174 (1974).

■ Confessions are prima facie involuntary and the burden is on the State to show a confession was freely and voluntarily made. *State v. Edwards, supra.* That burden is by a preponderance of evidence. *State v. Arredondo,* 111 Ariz. 141, 526 P.2d 163 (1974). Courts must look to the totality of the circumstances surrounding the giving of the confession, presented to them at "voluntariness hearings," and decide whether the State has met its burden. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Toney,* 113 Ariz. 404, 555 P.2d 650 (1976).

Presented to the trial judge, by the defense, were the facts that appellant had just lost his two children tragically; that his wife had "mysteriously" disappeared from the State; that he had been told by the officer who served the subpoena for the inquest (also Officer Malone) that Linda would be arrested if she didn't appear at the hearing; that, at one point during the interrogation or confession, the appellant pulled hair out of his own head in an apparent emotional outburst; that appellant had a history of medical treatment for severe headaches and was, perhaps, suffering from such a headache the night he gave the confession; that appellant did request appointment of an attorney from the justice of the peace; that appellant denied his confession to his father-in-law, Linda's stepfather, soon after giving it at the substation. Appellant contends that the severe headache, combined with these other, emotionally disturbing factors, especially the fear of his wife's imminent arrest, caused appellant to give a false confession.

The State, on the other hand, presented evidence that the appellant was sufficiently apprised of his *Miranda* rights and waived them, despite the earlier request to the justice of the peace; that, although he denied his confession, he gave his father-in-law no reason for having given the confession; that the appellant complained only once of a headache during the interrogation (and even then, refused aspirin); that Sgt. Malone, a policeman experienced in the questioning of suspects, felt the crying, pulling of hair and seeing of spots was an

act by the appellant; that appellant was never told his wife was going to be arrested for the arson-murder of their children (although appellant was obviously aware that they were both suspects); that Linda may have left the jurisdiction because of threats against her life by appellant.

██ Arguably, appellant may have been suffering from a severe headache. His own doctor, however, testified that the only way a doctor (or anyone else) can tell if someone is suffering from a headache, is if that person tells the doctor. In other words, the pain is subjective and cannot normally be measured. Even if the trial judge believed appellant was suffering from a headache, in order for this disability alone to render the confession involuntary, the judge must also be satisfied the accused was disabled "to such extent that he was unable to understand the meaning of his statements." *State v. Godinez*, 111 Ariz. 397, 398, 531 P.2d 154, 155 (1975).

Likewise, appellant's argument that he confessed to save his wife could be believed or disbelieved by the trial judge, especially in light of appellant's failure to tell his father-in-law that was why he had given a "false" confession so very soon after having given it.

> The trial judge had the opportunity to observe, first-hand, the witnesses and their demeanor. Determining from that, and all the evidence presented, that the statement was given knowingly, voluntarily and intelligently, we cannot disagree. *State v. Rodriguez*, 113 Ariz. 409, 412, 555 P.2d 655, 658 (1976).

██ We do not find the trial judge committed clear and manifest error in determining the confession was voluntarily, knowingly and intelligently given.

2. A.R.S. § 13–1673(B) reads:
   "When a person is charged with a capital offense the court may on its own initiative and shall upon application of the defendant and a showing that the defendant is financially unable to pay for such services, appoint such investigators and expert witnesses as are rea-

## APPOINTED EXPERT AND REFUSAL TO ALLOT FUNDS FOR TESTS

Pursuant to A.R.S. § 13–1673(B),[2] the trial judge appointed an arson expert, Marshall Smyth, to assist the appellant in his defense. Although the exact request is not set out in the record before us, apparently sometime before the second trial defense counsel requested a large expenditure to allow Mr. Smyth to recreate the Knapp children's bedroom for experimental purposes. This was in order to meet the State's objections to certain of Mr. Smyth's previous experiments, in that they did not meet the evidentiary requirements of substantial similarity of conditions to those existing at the time of the fire. *See* Udall, *Arizona Law of Evidence*, § 136.

All we really know of this request is the following exchange between defense counsel and the trial judge:

> DEFENSE COUNSEL: . . . I'd like the record to reflect that . . . upon the appointment of Mr. Smyth . . . as an expert . . . I made request of Mr. Smyth to construct an experiment where . . . he would recreate a room just like the Knapp children's bedroom so that there would be no objections from the State and so we could demonstrate what we're trying to prove here today, and that this request was denied on the grounds that there is not sufficient money to permit such tests that would meet . . . [the] . . . legal objections. . . .
>
> THE COURT: Well, your statement that the request was made and that it was denied because of the expense factor is correct, the record may show that.
> . . . .

Appellant points to *Bowen v. Eyman*, 324 F.Supp. 339 (D.Ariz.1970), as authority for

sonably necessary adequately to present his defense at trial and at any subsequent proceeding. Compensation for such investigators and expert witnesses shall be such amount as the court in its discretion deems reasonable and shall be paid by the county."

his assertion that due process requires expenditure of public monies for tests performed by a defense expert where those tests will exclude a defendant as the guilty party. Appellant is correct in his assertion but incorrect in comparing his situation to that of the defendant's in *Bowen*. That case dealt with a defense request, where the defendant was charged with rape, for an expert to test seminal fluid removed from the victim's vaginal tract in order to compare it with the defendant's blood. This comparison could have completely negated the defendant's guilt if the blood types of the two fluids were found totally incompatible. The State's experts could not, or would not, conduct the experiment.

The District Court said therein:

. . . "[F]undamental fairness" is the touchstone i. e. whether or not a defendant is entitled to a court-appointed expert depends on the facts and circumstances of the case. . . . [W]here tests could have been run which might have excluded petitioner as the guilty party, fundamental fairness was not accorded . . . . *Bowen v. Eyman*, 324 F.Supp. 339, 340.

Even more recently, the Ninth Circuit, in dealing with this issue has said that the due process issue is "whether denial or restriction of investigative funds has substantially prejudiced the defendant . . . ." *Mason v. Arizona*, 504 F.2d 1345, 1352 (9th Cir. 1974), *cert. denied*, 420 U.S. 936, 95 S.Ct. 1145, 43 L.Ed.2d 412 (1975). Referring to 18 U.S.C. § 3006A(e)(1),[3] which, in essence, is the same as A.R.S. § 13–1673(B), that court interprets federal law to say that reversal of a conviction is indicated only where a defendant establishes, by clear and convincing evidence, that he was prejudiced by the denial or restriction.

Aside from the bare assertion that he was prevented, by the trial judge's restriction of funds, from presenting one of his theories of defense, *i. e.*, that the fire was an ordinary combustible fire and not a flammable liquid fire, the appellant makes no showing of actual prejudice. There is an assertion that the experiment, if done, would completely exonerate the appellant, but this is not born out by Mr. Smyth's own testimony. On cross-examination, Smyth admitted he did not know the cause of the fire or the origin, despite being allowed on several occasions to thoroughly investigate the scene of the fire. He also admitted that he had no opinion as to whether or not an accelerant or flammable liquid was used in the fire.

The defense theory then was merely an alternative being offered to the jury as to the cause and origin of the fire. In view of the overwhelming evidence that a flammable liquid was used as an accelerant, we do not think the trial judge can be said to have abused the discretion afforded him by A.R.S. § 13–1673(B) in limiting the amount of money to be spent by the defense on a questionable experiment that would not have legally exonerated the appellant, but only offered a weak alternative theory to the trier of fact.

A.R.S. § 13–1673(B) is not to be construed as mandating, in every case, an appointment of investigators or experts, nor the expenditure of public money for their use, merely upon application. There must be a finding, by the trial court, (1) that the defendant is unable to pay for such services himself and (2) that the appointment and expenditure is reasonably necessary to present an adequate defense. This determination, like so many others, rests in the sound discretion of the trial court. In

---

**3.** This statute is not limited, however, to capital cases. It reads:

"(e) *Services other than counsel.—*

"(1) *Upon request.*—Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for an adequate defense may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services."

Under (e)(3) of this section, the maximum amount which can be allotted is $300.00 plus costs, except in unusual cases.

the absence of a showing that the determination was an abuse of that discretion, it will not be disturbed on appeal. A.R.S. § 13–1673(B). *Accord, State v. Frideaux,* § 207 Kan. 790, 487 P.2d 541 (1971). *Cf. Mason v. State of Arizona, supra.*

█ In deciding this issue we are aware of the fact that three constitutional rights are involved in it: due process, equal protection and effective assistance of counsel. We have considered all of the facts and circumstances of this case in light of those rights, and have determined that appellant has not been denied any of them. We think the Supreme Court of Indiana expressed our feeling about these issues well:

> We recognize that the State could not provide each indigent or middle income defendant with the same number of attorneys, investigators and experts as a rich man might decide to employ. A wealthy person may hire any number of people to aid in his defense, needlessly, or on a whim, or foolishly and the State does not control his expenditures. But, when the court is allocating state funds for the defense of a defendant, it is rational for the court to use discretion in granting or denying the defendant's requests . . . . Within the primary goal of the judicial process, which is due process of law for each defendant, the court may determine which expenses are probably needless, wasteful or extravagant. *Magley v. State,* Ind., 335 N.E.2d 811, 816 (1975).

The trial court in this case did not err in appointing the expert (who otherwise testified extensively at both trials in appellant's behalf), but refusing to allot him funds for a particular experiment.

## REFUSAL TO ALLOW EXPERT TO TESTIFY

At a conference in chambers, the State moved in limine to prevent the appellant from calling a Phoenix police officer, Eloy Ysassi, as an expert witness. Although the record is not clear as to what the testimony of the officer would be, it appears that defense counsel proposed to elicit testimony regarding the various techniques used in police interrogation. He further indicated that the purpose of this testimony was to show that some of the questioning of the defendant was done in a manner which would tend to bring forth less reliable testimony than if another method of interrogation had been used. This testimony it was contended was proper to assist the jury in determining the voluntariness and reliability of defendant's confession.

Our resolution of this issue would have been made easier on appellate review if the record contained a specific offer of proof either way of actual in-chambers testimony of the witness or an adequate paraphrase by counsel. Here we have neither. The trial court, after hearing considerable discussion and argument, granted the State's motion. The expert was not permitted to testify.

There is no doubt from the record that the proposed witness was an expert in the field of police interrogation. The basic question however is: did the trial judge abuse his discretion in excluding the expert testimony offered by defendant? To put the question another way: is this an area where the jury could not intelligently determine the issue of the reliability of the confession based on their own ordinary judgment and practical experience?

█ We hold that this is a matter within the discretion of the trial judge. There is no hard fixed rule which lays down guidelines for the determination of what areas of expertise mandate the use of expert witnesses. It is apparent that the judge determined that interrogation is sufficiently a matter of common knowledge so that the jurors could form a reasonable opinion themselves. *See Grismore v. Consolidated Products Co.,* 232 Iowa 328, 5 N.W.2d 646 (1942); *Rempfer v. Deerfield Packing Corp.,* 4 N.J. 135, 72 A.2d 204 (1950).

█ In a number of Arizona cases we have held that whether a witness is competent to testify as an expert is within the trial court's discretion. *State v.*

*Keener,* 110 Ariz. 462, 520 P.2d 510 (1974); *State v. Seebold,* 111 Ariz. 423, 531 P.2d 1130 (1975). This rule applies also to a determination of the areas in which expert testimony is appropriate. *State v. Owens,* 112 Ariz. 223, 540 P.2d 695 (1975); *State v. Kevil,* 111 Ariz. 240, 527 P.2d 285 (1974). We hold that in barring the expert witness the trial court did not abuse his discretion.

## DEATH PENALTY AS CRUEL AND UNUSUAL PUNISHMENT

■ Appellant contends that the punishment of death is cruel and unusual punishment under all circumstances and thereby violates both the United States and Arizona Constitutions.

In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the United States Supreme Court held otherwise, with regard to the Eighth and Fourteenth Amendments.[4] We cannot change that ruling. *Oregon v. Haas, supra.*

■ We have recently decided that the Arizona Constitution, likewise, does not prohibit the death penalty under all circumstances. *State v. Richmond,* 560 P.2d 41 (filed December 20, 1976). That decision, too, determined that our procedure for imposing the death penalty meets the constitutional mandates of *Gregg v. Georgia, supra.*

We are not inclined to change those recent determinations.

## DEATH PENALTY IMPROPERLY IMPOSED

Pursuant to A.R.S. § 13–454(A), a sentencing hearing for appellant was held. The trial court returned a special verdict thereafter, pursuant to § 13–454(C), in which he found that no mitigating circumstances existed, but one aggravating circumstance did: "The defendant committed the offense in an especially heinous, cruel or depraved manner." § 13–454(E)(6). The sentencing judge considered the possibility that one mitigating circumstance existed,

*i.e.,* "he was under unusual and substantial duress . . . ." § 13–454(F)(2). He then rejected that possibility, saying:

> . . . [T]here was evidence at the trial that he was afraid Mrs. Knapp was going to leave him. I don't believe that's the type of duress that's unusual, substantial duress to be a justification.

Appellant argues that, as a matter of law, the court's belief that the possible duress was not sufficiently unusual or substantial enough to amount to a mitigating circumstance was incorrect. He also submits that the finding of the aggravating circumstance was wrong for two reasons. First, he contends that under § 13–454(E)(6) any one of three factors, *i.e.* heinous, cruel or depraved, could be found to exist, and the trial court's failure to specify which of these exists in this case requires at the very least a remand for resentencing. Secondly, he submits that the record does not support a finding of any of those three factors anyway.

■ We disagree with all of appellant's contentions.

■ We must determine whether the evidence supports the sentencing court's finding of an absence of the statutory mitigating circumstance, *State v. Richmond, supra,* and in this case we are sure it does. Little evidence in mitigation was presented to the sentencing judge, and virtually none was offered on the existence of the mitigating circumstance of duress under § 13–454(F)(2). Equally little evidence of this mitigating circumstance was introduced at trial; the subject of duress came up only in the context of one of the State's theories for the motive of this crime, *i.e.,* that appellant feared his wife was going to desert him.

■ The burden of establishing mitigating circumstances is on the defendant. A.R.S. § 13–454(B); *State v. Richmond, supra.* It clearly was not met in this case.

---

**4.** So far, the United States Supreme Court has limited this decision to the crime of murder.

*See Gregg v. Georgia,* 428 U.S. at 187, 96 S.Ct. at 2932, n. 35.

We also must determine whether the evidence supports the sentencing court's finding of the existence of a statutory aggravating circumstance, and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. *State v. Richmond, supra.*

In two other recent Arizona cases, the existence of the "heinous, cruel or depraved" aggravating circumstance was found. *State v. Richmond, supra,* and *State v. Blazak,* 560 P.2d 54 (filed January 20, 1977). In *Richmond,* we found it unnecessary to determine its existence or nonexistence because the existence of another aggravating circumstance was undeniable. We did point out, however, that the United States Supreme Court approved the Florida Supreme Court's interpretation of "strikingly similar terms" *See Gregg v. Georgia, supra,* 428 U.S. 201, n. 52, 96 S.Ct. 2938, n. 52, and *Proffitt v. Florida,* 428 U.S. 242, at 255, 96 S.Ct. 2960 at 2968, 49 L.Ed.2d 913 (1976). The Florida court had said,

> What is intended to be included are those capital crimes where the actual commission . . . was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily torturous to the victims. *State v. Dixon,* Fla., 283 So.2d 1, 9 (1973).

In *Blazak,* we determined that the sentencing judge did not err in finding this particular aggravating circumstance. The appellant there had, during a robbery, shot a bartender and bar patron. The trial court had found that,

> . . . although there was noncompliance by the bartender with the defendant's attempt to rob him, there was actually no resistance as such by the bartender or any other people in the bar. . . [T]here was no justification in any manner for the action . . . which resulted in the killings. 560 P.2d 54 (Filed January 20, 1977).

Blazak coldly murdered two persons for absolutely no reason; the murder of the bar patron, a totally innocent bystander, was particularly unnecessary and conscienceless.

The words "heinous, cruel or depraved" have meanings that are clear to a person of average intelligence and understanding. Webster's Third New International Dictionary defines them as follows:

> heinous: hatefully or shockingly evil: grossly bad.
>
> cruel: disposed to inflict pain esp. in a wanton, insensate or vindictive manner: sadistic.
>
> depraved: marked by debasement, corruption, perversion or deterioration.

■ As has previously been commented upon by the Florida Supreme Court, "all killings are atrocious." *Tedder v. State,* 322 So.2d 908, 910 (Fla.1975). What our legislature intended to include as an aggravating circumstance was a killing wherein additional circumstances of the nature enumerated above set the crime apart from the usual or the norm. *State v. Dixon, supra.*

■ The facts in this case are simple and come directly from the appellant's mouth: he went into a room where his own two infant daughters were sleeping, he poured Coleman fuel, in great quantity, around the room, stood in the doorway and threw a lighted match into the room, then returned to his bed to lie down while the children burned and died. The autopsy revealed that the cause of death was not just carbon monoxide poisoning, the blood level of which was very low, but also incineration. We can hardly think of a more ghastly death than this for anyone. We believe it falls squarely within the meaning of "heinous, cruel or depraved."

The sentence in this case was clearly not improperly imposed. No mitigating circumstance "sufficiently substantial to call for leniency" was established. An aggravating circumstance was clearly established. Under these circumstances, the trial court had no choice but to impose the penalty of death. A.R.S. § 13–454(D); *State v. Blazak, supra.*

The judgment and sentence are affirmed.

CAMERON, C. J., STRUCKMEYER, V. C. J., and HOLOHAN and GORDON, JJ., concur.