658 P.2d 808

STATE of Arizona, Appellee,

v.

Albert Neil MILLER, Appellant.

No. 1 CA–CR 4935.

Court of Appeals of Arizona,
Division 1, Department B.

Oct. 19, 1982.

Rehearing Denied Jan. 11, 1983.

Review Denied Feb. 1, 1983.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Chief Counsel, Crim. Div., Gerald R. Grant, Asst. Attys. Gen., Phoenix, for appellee.

Henry J. Florence, Ltd. by Joel Erik Thompson, Phoenix, for appellant.

**10**

## OPINION

GRANT, Judge.

The defendant appeals from his conviction of second degree murder, a class 2, dangerous felony, A.R.S. §§ 13–1104 and 604, and his sentence to the presumptive term of 10½ years. He raises five issues for consideration: (1) whether the trial court erred in denying his motion to quash the jury panel because it was not selected in accordance with A.R.S. § 21–301; (2) whether the trial court erred in determining that statements made by the defendant to the police were voluntary and thus admissible at trial; (3) whether the trial court erred in admitting into evidence the opinion of various witnesses that the victim was not a prostitute, certain handwritten notes prepared by one of the investigating police officers, and evidence that the defendant had two pending charges of driving while intoxicated; (4) whether the trial court erred in refusing to give the defendant's requested instructions number 1, number 12, and in deleting a portion of the defendant's requested instruction number 7, and whether the trial court properly instructed the jury concerning the requisite mental states; and (5) whether the trial court erred in sentencing the defendant for a dangerous nature offense pursuant to A.R.S. § 13–604. We affirm the judgment and remand for resentencing.

The evidence introduced at trial reveals that on February 24, 1980, a citizen discovered the body of the victim, Geraldine Davinroy, in the desert, and called the police. Various officers of the Maricopa County Sheriff's Office responded to the call and investigated the area where the victim's body was located. The officers photographed the area and seized numerous items of physical evidence which were later introduced at trial. Some of these items included empty beer cans, butts of cigarettes of the type smoked by the defendant, and a torn pair of woman's underwear. The body of the victim was clad in a halter top and a pair of pants which were unzipped and pulled down so that the victim's pubic area was exposed. It appeared that the body had been dragged on the ground. The autopsy revealed that the cause of the victim's death was asphyxiation due to smothering. A blood alcohol examination revealed that the victim's blood alcohol level was .13 percent, and a test for valium was negative. A vaginal swab was done and found to be positive for seminal fluid and negative for spermatazoa.

Upon further investigation of the case, the officers discovered that the victim had left a bar with the defendant on the night of February 23, 1980. The police went to the residence of the defendant and determined that the tire tracks found in his driveway were similar to tire tracks found at the scene. They then contacted the defendant at his place of employment and executed a search warrant on his car. The defendant agreed to speak with the police in the business office at his place of employment. Detective Coppock advised the defendant from memory of his *Miranda* rights, including that if the defendant could not afford an attorney, "one would be provided for him without cost." Officer Coppock asked the defendant if he understood his rights, and if he would voluntarily waive the presence of an attorney and talk to them. The defendant indicated that he understood the rights and would talk to officers. At that point the defendant told the officers that he had gone to the Dakota bar on the night of February 23rd because there was a party there, that he had gotten intoxicated, that he had left at approximately closing time and had gone home and gone to bed. The officers then asked the defendant if he would go to the Mesa substation in order to conduct a complete interview. The defendant agreed.

When the defendant and the officers arrived at the Mesa substation, the officers advised him that his *Miranda* rights were still in effect, and the defendant responded that he knew that they were in effect and that he would voluntarily answer questions and cooperate. The defendant said that as he was leaving the Dakota bar on the night of February 23rd, he noticed a girl outside the bar leaning against one of the cars. He

stated that the woman asked him for a ride to another bar, and he agreed to take her there. He told the officers that they got in his car and proceeded south on Meridian where, at the corner of Meridian and Broadway, the victim mumbled something to him, grabbed the remaining beers and exited the vehicle, at which time the defendant went home. Detective Coppock made notes of this statement, and reviewed them with the defendant so that he could make any corrections that he deemed necessary. The defendant read through the notes and initialed the bottom of each page. Detective Coppock then explained to the defendant that there were numerous inconsistencies between his statement and the facts that the police investigation had revealed to that point. The defendant hung his head and stated: "I didn't mean to do it," and agreed to give the officers another statement.

Thereupon the defendant said that he had previously told the truth up to the point of Broadway and Meridian, but the girl had not gotten out of the car. He stated that she offered to have sexual intercourse with the defendant if he would pay her $20.00. The defendant agreed and drove to a desert area where he had sexual intercourse with the victim. She then demanded an additional $60.00 and he refused to give her more money. He stated that she then threatened to tell his wife and police officers that he had raped her, and that she was going to have a friend of hers kill him. He said that she tried to get out of the car, he grabbed her, put her back in the car, and they fought. He stated that he put his hand on her throat and held her until she went limp. Thereafter he dragged her from the car and left the scene.

The defendant agreed to make this statement on a tape recording. A transcript was made of this tape recording which indicates that Coppock advised the defendant of his *Miranda* rights, including that an attorney would be provided for him without cost if he could not afford one. The defendant basically repeated his statements to the officers concerning the offense. The officers then noticed that the tape recorder ap-

peared to be malfunctioning, so they procured another tape recorder, and made a second tape of the statements. On the second tape, Officer Coppock partially again advised the defendant of his rights omitting the warning that if he could not afford an attorney one would be provided for him without cost.

The evidence also revealed that Detective Palmer was present with Officer Coppock during the questioning of the defendant, and that Detective Palmer handed the defendant a standard rights card at the defendant's place of employment which the defendant read and signed. At the conclusion of the second tape recorded statement, Officer Coppock advised the defendant that he would save the tapes for his attorney, and the defendant responded "I haven't got no money to get an attorney."

On March 4, 1980, the grand jury returned an indictment charging the defendant with first degree murder and sexual assault. The matter proceeded to trial, and the jury found the defendant guilty of second degree murder and not guilty of sexual assault. The trial court sentenced the defendant pursuant to A.R.S. § 13–604(K) to serve the presumptive term of 10½ years.

Prior to trial the defendant moved for a voluntariness hearing concerning the admissibility of his statements to the police, Detective Coppock's notes, tape recordings and the transcripts of the tape recordings. The trial court determined that the statements made by the defendant were voluntary and admissible, and that Detective Coppock's notes, the tape recordings and the transcripts of the tape recordings were also admissible. The defendant also moved to quash the jury panel for non-compliance with A.R.S. § 21–301. This motion was also denied by the trial court. Finally, at sentencing, the defendant objected to being sentenced for a dangerous nature offense in accordance with A.R.S. § 13–604(K).

### SELECTION OF THE JURY

For his first issue on appeal the defendant contends that he was tried by an

improperly selected jury. A.R.S. § 21–301(B) provides as follows:

> The jury commissioner of each county shall prepare and maintain a current jury list of eligible jury candidates. The list shall be comprised of the names and addresses of eligible persons who reside in the county and shall include persons on the voter registration list of the county, other persons eligible for jury service who have been licensed pursuant to title 28, chapter 4, article 2 and persons from other lists as determined by the supreme court. The jury list shall be prepared so as to avoid duplication of the names of eligible juror candidates.

Thus, effective June 1, 1980, jury lists were to include both registered voters and licensed drivers. The jury list used to select the jury in the instant case contained only registered voters and did not include licensed drivers. At the hearing on the defendant's motion to quash the jury panel, the trial court noted that licensed drivers were not a part of the jury list, stating that the jury commissioner had not yet been able to program the additional names from the driver's license list into the computer. The court also noted that A.R.S. § 21–301(B) was enacted in 1978, but that it did not become effective until June 1, 1980. The defendant's trial commenced July 17, 1980. The trial court noted the jury commissioner's belief that she could not program the names of licensed drivers into the computer until the effective date of the statute, and denied the defendant's motion to quash the jury panel.

The defendant contends that since he was tried by an illegally selected jury, he need not show prejudice resulting therefrom. *W.E. Roche Fruit Company v. Northern Pacific Railway Company,* 18 Wash.2d 484, 139 P.2d 714 (1943); *State v. Finlayson,* 69 Wash.2d 155, 417 P.2d 624 (1966). While it may be the law in the State of Washington that when a jury is selected in a manner that *materially departs* from the statute

error may be claimed without showing prejudice, that is not the law in Arizona. In *State v. Mahoney,* 106 Ariz. 297, 475 P.2d 479 (1970) *cert. denied,* 401 U.S. 917, 91 S.Ct. 898, 27 L.Ed.2d 818 (1971) the defendant contended that his jury panel was not selected according to law and that he was discriminated against because he was not among the group of prospective jurors. The court there noted that while the juror list was comprised of a list of registered voters, and while the legislature had changed the method of selecting a jury, the defendant did not show prejudice in the selection of the jurors in his case. The court held that the denial of a challenge to a panel of jurors on the ground that it was not selected according to law is not fatal unless the defendant establishes prejudice. "In order to establish prejudice or denial of due process, it would be necessary for defendant to show a systematic jury discrimination which excluded from the jury defendant's peers and equals of the community." 106 Ariz. at 302, 475 P.2d at 484. *See also State v. Brierly,* 109 Ariz. 310, 509 P.2d 203 (1973). At trial, the defendant did not allege a systematic jury discrimination which excluded from his jury panel his peers and equals in the community, nor did he claim in any other regard how he was prejudiced by the selection of the jury panel from voter registration lists only.

On appeal, the defendant has claimed that his jury was selected from a substantially smaller pool than was required by the statute. While his claim may be factually correct, we held in *State v. Acosta,* 125 Ariz. 146, 608 P.2d 83 (App.1980) that the use of voter registration lists for the selection of grand jurors was not discriminatory. There is no reason a different result should occur for the use of voter registration lists to select the trial jury[1] in this case. The defendant has failed to show how he was prejudiced by the selection of the jurors in this case. The trial court properly denied his motion to quash the jury panel.

1. We noted in *State v. Acosta* that fifth amendment and fourteenth amendment challenges to grand juries were not analogous to sixth amendment challenges to state juries; never-

theless, the defendant *in this case* has failed to show a systematic discrimination in the selection of his petit jury from the voter registration lists.

## ADMISSIBILITY OF THE DEFEND-
## ANT'S STATEMENTS TO
## THE POLICE

The defendant next argues that the trial court erred in determining that his statements made to the police were voluntary, and that the statements, the tape recordings of the statements and the transcripts of the tape recordings were admissible. He asserts that the statements were obtained from him in violation of his fifth and sixth amendment rights because in giving the statements, the defendant did not act "voluntarily, knowingly and intelligently." *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The basis of the defendant's argument is his claim that he did not know that he had a right to a lawyer during questioning *at no cost to him.* He asserts that Detective Palmer handed him a printed rights card which stated:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to the presence of an attorney to assist you prior to questioning and to be with you during questioning if you so desire. If you cannot afford an attorney, you have the right to have an attorney appointed for you prior to questioning.

The defendant points out that nothing on the standard printed rights card indicates that a suspect has the right to have an attorney provided for him at no cost. He also contends that Detective Coppock neglected to mention that he had a right to a lawyer without cost to him. At the voluntariness hearing, the defendant testified that he could not afford an attorney, but if he could have afforded one he would have wanted an attorney present during the questioning. He also testified that each time that he had been appointed lawyers for his driving while intoxicated citations, the court-appointed lawyers had cost him money. He stated that he had never had a court-appointed attorney which didn't cost him money. The defendant concludes that his being advised that he had a right to a court-appointed attorney was not sufficient to advise him of the rights he was waiving by making a statement, because his experience was that a court-appointed lawyer would cost him money, and he could not afford it. He asserts that it is incumbent on the police in such circumstances to advise an indigent suspect that he will be supplied free counsel if necessary, because advising a suspect of his rights in a manner that is not comprehensible to him is a mockery of the requirements of *Miranda.* He cites in support of his claim *Commonwealth v. Ritchey,* 431 Pa. 269, 245 A.2d 446 (1968) and *Commonwealth v. Romberger,* 464 Pa. 488, 347 A.2d 460 (1975), both of which hold that there is not a knowing and intelligent waiver of the right to counsel unless the police explicitly inform an indigent defendant that he is entitled to free counsel.

The defendant's arguments are based on a misstatement of the facts and the evidence presented at the voluntariness hearing. Detective Coppock testified that he advised the defendant of his *Miranda* warnings at his place of employment, and that he specifically at that time advised the defendant that he was entitled to the assistance of an appointed attorney *at no cost to him.* Detective Palmer then handed the defendant the standard rights card which concededly does not contain a statement to the effect that a defendant is entitled to the assistance of an attorney free of charge. Nevertheless, the transcript of the first tape recorded interview with the defendant at the police station clearly contains the following exchange:

> DETECTIVE COPPOCK: And prior to any conversation did I advise you of certain rights?

> ALBERT MILLER: Yes sir.

> DETECTIVE COPPOCK: And I advised you that you had the right to remain silent?

> ALBERT MILLER: Yes sir.

> DETECTIVE COPPOCK: And anything you said could be used against you in a court of law?

> ALBERT MILLER: Yes sir.

> DETECTIVE COPPOCK: And that you had a right to the presence of an

attorney prior and during questioning if you so desire?

ALBERT MILLER: Yes sir.

DETECTIVE COPPOCK: And if you could not afford an attorney, one would be provided for you *without cost?*

ALBERT MILLER: Yes sir.

DETECTIVE COPPOCK: And I also advised you that any time during the interview you could stop and, and request an attorney, or stop talking, is that correct?

ALBERT MILLER: Yes sir.

DETECTIVE COPPOCK: Okay. And you stated that you understood your right?

ALBERT MILLER: Yes sir.

DETECTIVE COPPOCK: And you stated that you voluntarily talk to us?

ALBERT MILLER: Yes sir.

DETECTIVE COPPOCK: Okay. And you related that you had heard the rights prior? Is that correct?

ALBERT MILLER: Yes sir.

DETECTIVE COPPOCK: And that you had a 12th grade education?

ALBERT MILLER: Yes sir.

(Emphasis added)

The transcript of the last taped statement indicates that Detective Coppock did not advise the defendant that he had a right to an attorney at no cost, but it is clear that three times prior to that statement, the officers fully advised the defendant of his constitutional rights, and twice specifically mentioned that he had the right to an attorney at no cost. Each time the defendant was advised of his rights, he stated that he understood his rights, that he was willing to voluntarily speak with the officers, that he had not been promised anything in exchange for his statements, that he had not been promised leniency in exchange for his statements, that he had not been coerced in any manner, and that the police had not threatened him in any way. At no time during the conversations did the defendant indicate that he wished to invoke his right to remain silent, yet on at least three occasions, he was specifically advised that he had the right to remain silent. At no time

during the conversations with the officers did the defendant indicate that he wanted an attorney, yet at least three times he was specifically advised that he had a right to have an attorney present with him during questioning. Finally, at no time during the conversations did he state to the officers that he did not understand that his right to an attorney meant that an attorney would be provided at no cost to him, even though he was specifically advised at least twice that his right to an attorney meant that an attorney would be provided at no cost to him.

▇▇▇ While the law in Arizona is clear that confessions are *prima facie* involuntary and the burden is on the state to show that they were freely and voluntarily made, *State v. Osbond,* 128 Ariz. 76, 623 P.2d 1232 (1981) *cert. denied* 454 U.S. 846, 102 S.Ct. 163, 70 L.Ed.2d 133; *State v. Arnett,* 119 Ariz. 38, 579 P.2d 542 (1978), in the absence of clear and manifest error, this court will not disturb the trial court's ruling on the admissibility of statements. *State v. Knapp,* 114 Ariz. 531, 562 P.2d 704 (1977), *cert. denied* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978). In making a ruling concerning admissibility of statements, the trial court sits as a finder of fact and determines the credibility of the witnesses. That the trial court did not accept the defendant's contention in light of Detective Coppock's testimony and the statements contained on the first tape is not surprising. We find that the defendant has failed to show that the trial court committed clear and manifest error in resolving the voluntariness hearing against him.

## EVIDENTIARY ISSUES

▇▇▇ For his third issue on appeal, the defendant contends that he was deprived of a fair trial when the trial court admitted prejudicial evidence against him in three instances. The defendant's first contention is that the trial court erred in allowing the state to present evidence that the victim was not a prostitute prior to the defendant having introduced evidence of her charac-

ter. Such evidence was only material to the charge of sexual assault. While we find that such evidence was admissible, we fail to see how the defendant was prejudiced in any event by the admission of the state's evidence because the defendant was found not guilty on the charge of sexual assault. It is clear that the jury believed that the act of sexual intercourse between the defendant and the victim was a consensual act, and in light of the jury's verdict of not guilty on this charge any claim concerning the improper admission of evidence of the victim's reputation for prostitution must be harmless.

■ Secondly, the defendant argues that handwritten notes prepared by Detective Coppock constituted hearsay and should not have been admitted. These notes were taken by Detective Coppock when the police and the defendant first arrived at the police station, and the defendant originally told the police that the victim mumbled something to him, stole his beer, and jumped out of the car. These were notes of the defendant's statement to the police given just prior to his confession. The record reveals that at the conclusion of this particular conversation, Detective Coppock showed his notes to the defendant, and the defendant read over the notes, checking them for accuracy. He initialed each page of the notes. The defendant objected at trial that the notes should not have been admitted because they were hearsay, and the trial court overruled the objection.

Rule 801(d)(2)(B) provides that a statement is not hearsay if "[t]he statement is offered against a party and is . . . a statement of which he has manifested his adoption or belief in its truth, . . ." The state argues that by reviewing and initialing Detective Coppock's notes, the defendant manifested his adoption of those notes and his belief in their truth, and that they thus became an admission by a party opponent and were properly admitted. We agree. Although the statement was prejudicial because it showed that the defendant originally did not tell the officers the truth, the defendant did adopt the statement as

his own by reviewing it for accuracy and initialing it. We find no error in the admission of Detective Coppock's notes.

■ Thirdly, the defendant argues that the trial court erred by admitting the tape recorded statements in their entirety. During these tape recorded statements, the defendant stated that he had two pending charges for driving while intoxicated. Prior to admitting the evidence of these statements, the trial court held a hearing and listened to the tape recordings in their entirety while comparing them to the transcripts of the recordings. The prosecutor had deleted the reference to the charges of driving while intoxicated in the transcripts in anticipation that the reference to the charges might be found inadmissible. The trial court overruled the defendant's objection to the admission of the reference to the charges of driving while intoxicated and ruled that the tapes would be played in their entirety. When the jury heard the tapes, they were given transcripts to follow, and were advised by the trial court that an omission existed in the transcripts and that the court had reviewed the tape and transcripts and ruled that the jury could hear the deleted part. The tapes were played for the jury up to the omission and then were stopped while the court advised the jury that the omitted part would be played for them. The defendant argues that any reference to the charges of driving while intoxicated was prejudicial and inadmissible, and that the procedure utilized by the court highlighted this damaging and inadmissible evidence.

Rule 404(b), Rules of Evidence, 17A A.R.S. provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In both of his tape recorded statements to the police, the defendant told the officers

**16**

that the victim had asked him to give her a ride to another bar, and that he had not taken the direct route to that bar because he had been drinking and he had charges of driving while intoxicated pending against him. Therefore the evidence at trial was that the defendant traveled the route that led him to the site of the crime because he wanted to stay off the main road and avoid another citation for driving while intoxicated. The evidence was therefore directly relevant to the defendant's opportunity to commit the crime, because his driving off the main road led him to the desert where the victim was found. The state also points out that the evidence could not have prejudiced the defendant because absent the evidence of the driving while intoxicated charges, the jury could have presumed that the defendant did not take the main road because he intended to take the victim to the desert to rape her. Finally, while the procedure used by the trial court in playing the tapes may have highlighted the evidence of the prior charges of driving while intoxicated, we conclude that this procedure did not unduly prejudice the defendant. The procedure was utilized by the trial court simply to point out to the jury that there was an omission in the transcript. The trial court's statements to the jury therefore clarified for them any confusion that the jury may have had while comparing the written transcripts to the tape recordings. While the preferable procedure would have been to present the jury with complete transcripts so that the trial court's statements would have become unnecessary, we find that the trial court did not err in admitting the evidence of the pending charges of driving while intoxicated, nor in pointing out to the jury that the tape recordings contained portions which were deleted from the transcripts.

### INSTRUCTIONS

■ The defendant next asserts that the trial court erred in failing to give his requested instruction concerning the destruction of Officer Palmer's notes, his requested instruction number 1 on the presumption of innocence and reasonable doubt in the law

of lesser included offenses, a portion of his requested instruction number 7 concerning felony murder, and that the trial court erred in instructing the jury concerning general intent. We find no error in the trial court's rulings on the instructions.

The defendant's requested instruction number 12 which the trial court declined to give was as follows:

If you find that the conduct of the State of Arizona or any of its agents has destroyed, caused to be destroyed or allowed to be destroyed any evidence whose contents and quality are in issue, you may infer that the true facts of such evidence would be against the interest of the prosecution. This is true whether such destruction was intentional or not, or merely resulted from an unwillingness to make the necessary effort to preserve such evidence, regardless of whether such actions were intentional or simply carelessness or negligence. This in itself can create a reasonable doubt as to the defendant's guilt.

The defendant requested this instruction with regard to Detective Palmer's police report. Detective Palmer was present during the interrogation of the defendant and took handwritten notes from which he prepared a police report. Those notes were destroyed, and the defendant argues that they should have been preserved and produced in compliance with rule 15, Ariz.R. Crim.P., 17 A.R.S. He asserts that the only means by which a trial court could determine whether the notes had been incorporated into the detective's report would be to examine the notes and make such a determination. He argues therefore that the defendant's instruction should have been given under *State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964).

During the cross-examination of Detective Palmer, the defendant asked him if he had taken written notes of his conversations with the defendant, and he stated that he had. The detective also testified that those notes had been destroyed after he had substantially incorporated the notes into his report.

Rule 15.4(a)(2) provides that handwritten notes which are substantially incorporated into a formal report "shall no longer themselves be considered a statement." The formal report then itself constitutes a statement. Rule 15.4(a)(1)(iii). In *State v. Brooks*, 127 Ariz. 130, 618 P.2d 624 (App. 1980), this court held that where there was no evidence of bad faith on the part of the state in destroying the notes, and when the defendant was unable to establish how he was prejudiced by the destruction of the notes, it was not error for the trial court to allow a police officer to testify to the defendant's confession where the police officer used a departmental report prepared from the interrogation notes which he subsequently destroyed. In *State v. Johnson*, 122 Ariz. 260, 594 P.2d 514 (1979), the Arizona Supreme Court held that the destruction of an officer's handwritten notes did not constitute reversible error even where the officer testified that many things which were in his notes were not reflected in his final report. In the instant case, the defendant has not claimed that the officer destroyed the notes in bad faith, nor did he present any evidence which would suggest that Detective Palmer did not substantially incorporate his notes into his final report. It is clear, therefore, that the provisions of rule 15.4(a)(2) were substantially complied with, and that the officer's departmental report became the discoverable statement pursuant to rule 15. Under these circumstances, the defendant was not entitled to his requested instruction number 12 in accordance with *State v. Willits, supra*.

The defendant also argues that the trial court erred in refusing to give his requested instruction number 1 and in deleting a portion of his requested instruction number 7. The only argument made with regard to these instructions is that they are from A.R.S. § 13–115 and A.R.S. § 13–1105(B), and were therefore appropriate law for the instruction of the jury. The defendant's requested instruction number 1 reads as follows:

Arizona Revised Statute § 13–115 provides that a defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to be acquitted. Furthermore, when it appears that a defendant has committed a crime or public offense, and there is reasonable ground of doubt in which of two or more degrees he is guilty, he may be convicted of the lowest such degrees only.

It is clear that the trial court is not required to give a requested instruction which is substantially covered by the other instructions. *State v. Printz*, 125 Ariz. 300, 609 P.2d 570 (1980). In this case, the trial court instructed the jury concerning the presumption of innocence and reasonable doubt. The trial court further instructed the jury on the law of lesser included offenses and specifically instructed the jury on all degrees of homicide. We find that the defendant's requested instruction was amply covered by the other instructions given by the trial court.

The portion of the defendant's requested instruction number 7 dealing with felony murder which the trial court refused to give reads as follows:

No specific mental state is required other than the mental state required for committing or attempting to commit the crime of sexual assault.

The entire instruction number 7 requested by the defendant which was given by the trial court with the exception of the deleted portion stated the elements of first degree murder, including the culpable mental states, second degree murder, including the culpable mental states, manslaughter, and negligent homicide. The portion deleted from the defendant's requested instruction number 7 dealt with felony murder, and the trial court instructed the jury on felony murder as follows:

[A] person commits first degree murder if:

1. He commits or attempts to commit a sexual assault; and

2. In the course of and in furtherance of the offense, he causes the death of any person whether the killing is intentional, unintentional or accidental.

With regard to sexual assault, the trial court instructed the jury as follows:

A person commits sexual assault by intentionally or knowingly engaging in sexual intercourse with any person not his or her spouse without consent of such person.

It is clear therefore that the trial court correctly instructed the jury on felony murder, and the portion of the defendant's requested instruction which was deleted added nothing to the trial court's instruction. We find that the jury was adequately and completely instructed on the elements of felony murder, and that the trial court did not err in deleting the portion of the defendant's requested instruction number 7. *State v. Printz.* Further, the jury convicted the defendant of second degree murder, rather than first degree or felony murder, and therefore any claim of error by the defendant concerning the instructions for felony murder must, of necessity, fail under the doctrine of harmless error.

■ The defendant next argues that the trial court erred in instructing the jury in accordance with *R.A.J.I. Criminal Standard 4* which reads:

The state must prove that the defendant has done an act which is forbidden by law and that he intended to do it. You may determine that the defendant intended to do the act if he did it voluntarily. The state does not have to prove that the defendant knew the act was forbidden by law.

The defendant argues that this instruction equated "intentional" with "voluntary", and that the court therefore misled the jury as to the requisite culpable mental state required for conviction. The trial court instructed the jury on the culpable mental states, including the following instruction on "intentionally":

Intentionally means, with respect to a result or to conduct described by a statute defining an offense, that a person's objective is to cause that result or to engage in that conduct.

The trial court also instructed the jury as to the culpable mental state required for con-

viction of each degree of homicide and of sexual assault. The defendant's argument was specifically rejected in *State v. Rodriguez,* 114 Ariz. 331, 560 P.2d 1238 (1977). His contention in this regard has no merit.

## SENTENCING PURSUANT TO A.R.S. § 13–604(K)

■ For his final issue on appeal, the defendant contends that he was improperly sentenced for a dangerous nature offense pursuant to A.R.S. § 13–604(K). He asserts that the issue of dangerousness was not submitted to the jury in accordance with *State v. Parker,* 128 Ariz. 97, 624 P.2d 294 (1981), and that the verdict of the jury does not necessarily include a finding that the defendant knowingly or intentionally caused serious physical injury to the victim, *State v. Tresize,* 127 Ariz. 571, 623 P.2d 1 (1980).

A.R.S. § 13–1104 defines second degree murder as follows:

A. A person commits second degree murder if without premeditation:

1. Such person intentionally causes the death of another person; or

2. Knowing that his conduct will cause death or serious physical injury, such person causes the death of another person; or

3. Under circumstances manifesting extreme indifference to human life, such person recklessly engages in conduct which creates a grave risk of death and thereby causes the death of another person.

In *State v. Barrett,* 132 Ariz. 88, 644 P.2d 242 (1982), the supreme court held that a conviction for second degree murder pursuant to A.R.S. § 13–1104(A)(1) or (2) necessarily included a finding that the defendant either intentionally killed the victim or that he caused the death of the victim by conduct which he knew would cause death or serious physical injury, and thus necessarily included a finding of dangerousness pursuant to A.R.S. § 13–604(K), authorizing a finding of dangerousness, when "the intentional or knowing infliction of serious physical injury upon another" has occurred. In

*State v. Barrett,* the jury was not instructed on the elements of a reckless second degree murder in accordance with the provisions of A.R.S. § 13–1104(A)(3). A finding of guilt of second degree murder pursuant to the reckless provision of the statute would not constitute a dangerous nature offense pursuant to A.R.S. § 13–604(K) because that section requires an intentional or knowing infliction of serious physical injury. In this case, the trial court instructed the jury as to every degree of homicide including second degree murder pursuant to A.R.S. § 13–1104(A)(3). The trial court also instructed the jury with regard to "recklessly" as follows:

> Recklessly means, with respect to a result or to a circumstance described by a statute defining an offense, that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard of such risk constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware of such risk solely by reason of voluntary intoxication also acts recklessly with respect to such risk.

Prior to sentencing, the defendant objected to his being sentenced in accordance with the provisions of A.R.S. § 13–604. The trial court ruled that under the circumstances of the case, there was no theory under which the defendant could have been convicted of second degree murder committed recklessly in accordance with the provisions of A.R.S. § 13–1104(A)(3). The state's theory of the case was that the defendant committed either premeditated first degree murder or felony murder in the commission of a sexual assault. The defendant's confessions to the police were admitted into evidence. The defendant also testified in his own behalf that the killing of the victim was an accident which resulted from his falling on her and inadvertently putting his hands to her throat after she had kicked him in the groin. The defendant also testified that he had been drinking a substantial amount on that date.

We find that, under the facts of this case, it is possible that the jury could have found that the defendant committed second degree murder pursuant to A.R.S. § 13–1104(A)(3). The jury could have found that the defendant, in placing his hands on the victim's neck and holding them there for an extended period of time, manifested an extreme indifference to human life and engaged in conduct which created a grave risk of death. The jury could also have found under the evidence that the defendant was unaware of the risk solely by reason of his intoxication, and that he further acted recklessly in leaving the body of the victim in the desert, when, according to his testimony, he did not know if she was dead. Such a finding by the jury would not necessarily include a finding of knowingly or intentionally causing serious physical injury pursuant to A.R.S. § 13–604(K) and it would have been necessary, therefore, for the jury to make a separate, specific finding on the allegation of dangerousness. *State v. Parker.* Accordingly, we find that the trial court erred in sentencing the defendant in accordance with the provisions of A.R.S. § 13–604(K), and vacate the sentence heretofore imposed by the trial court.

For the foregoing reasons, the judgment is affirmed; the sentence is vacated, and this matter is remanded to the trial court for resentencing in accordance with the provisions of A.R.S. § 13–701.

JACOBSON, J., and RICHARD M. DAVIS, J. Pro Tem., concur.

NOTE: The Honorable Richard M. Davis, a Judge *pro tempore* of a court of record, has been authorized to participate in this matter by the Chief Justice of the Arizona Supreme Court, pursuant to Arizona Const. art. VI, § 20.