821 P.2d 731

STATE of Arizona, Appellee,

v.

**Daniel Wayne COOK, Appellant.**

**No. CR–88–0301–AP.**

Supreme Court of Arizona,
En Banc.

Dec. 5, 1991.

Reconsideration Denied Jan. 21, 1992.

---

Grant Woods, Atty. Gen. by Gerald R. Grant, Phoenix, for appellee.

George M. Sterling, Jr., Phoenix, for appellant.

## OPINION

FELDMAN, Vice Chief Justice.

Defendant Daniel Wayne Cook was convicted of two counts of first degree murder and sentenced to death on both counts. We have jurisdiction over this automatic appeal pursuant to article 6, § 5(3) of the Arizona Constitution, and A.R.S. §§ 13-4031 and 13-4033.

## FACTS AND PROCEDURAL HISTORY

Shortly after 4:00 a.m. on July 21, 1987, John Matzke and Byron Watkins arrived at the Lake Havasu City Police Department, where Matzke reported his involvement in two murders committed at his apartment during the evening of July 19 and early morning of July 20. Matzke told officers about the crimes and granted the police consent to enter the apartment. Investigating officers went to the apartment that Matzke shared with Cook. After arresting Cook, officers searched the apartment and discovered the bodies of Carlos Cruz Ramos and Kevin Swaney in the closet of Matzke's bedroom. Autopsies revealed that both victims had been strangled.

Cook and Matzke were each indicted on two counts of first degree murder. In return for the state's dismissal of all other charges, Matzke agreed to plead guilty to one count of second degree murder and to testify against Cook. Cook was not offered a plea agreement. At trial Matzke related the following sordid story of bondage, torture, and sodomy, in which Cook was the principal protagonist.

Carlos Cruz Ramos was a Guatemalan national employed at the same restaurant where Cook and Matzke worked. He had recently moved into their apartment. According to Matzke, Cook devised a plan to steal Cruz Ramos' money. While Matzke distracted Cruz Ramos, Cook stole approximately $90 from Cruz Ramos' money pouch. Shortly afterward, Cruz Ramos noticed his money was missing, and asked Cook and Matzke whether they knew anything about it. The two then lured Cruz Ramos into Cook's upstairs bedroom. They pushed Cruz Ramos down on the bed and, using strips torn from Cook's sheets, gagged him and tied him to a chair.

Over the course of the next six or seven hours, Cruz Ramos was cut with a knife, beaten with fists, a metal pipe and a wooden stick, burned with cigarettes, sodomized, and had a staple driven through his

foreskin. Matzke suggested that they kill Cruz Ramos because they could not let him go. Cook replied that Cruz Ramos should be killed at midnight, "the witching hour." When midnight arrived, Matzke first tried to strangle Cruz Ramos with a sheet. Matzke then took Cruz Ramos out of the chair, put him on the floor, and pushed down on his throat with a metal pipe. According to Matzke, because Cruz Ramos still would not die, Cook pressed down on one end of the pipe while Matzke pressed on the other. Finally, Matzke stood on the pipe as it lay across Cruz Ramos' throat and killed him.

Matzke and Cook later dressed Cruz Ramos and put him in the closet of Matzke's bedroom. The autopsy revealed that Cruz Ramos had suffered severe lacerations and contusions as a result of his beating, that he had been cut on the chest, and that his stomach and genitals had been burned. The autopsy also revealed that Cruz Ramos had two puncture holes in his foreskin and that his anus was dilated, although no semen was detected.

Kevin Swaney was a sixteen-year-old runaway and sometime guest at the apartment. He was a dishwasher at the restaurant where the others worked. Shortly after 2:00 a.m., approximately two hours after Cruz Ramos' death, Swaney stopped by the apartment. Cook initially told Swaney to leave, but subsequently invited him inside. Cook and Matzke told Swaney they had a dead body upstairs and, according to Matzke, Cook took Swaney upstairs and showed him Cruz Ramos' body. Swaney was crying when he and Cook returned downstairs. Cook reportedly told Swaney to undress, and Swaney complied, and Cook and Matzke then gagged him and tied him to a chair in the kitchen. Matzke said he told Cook that he would not witness or participate in Swaney's torture. Matzke then went into the living room and fell asleep in a chair.

Cook later woke Matzke, who said he saw Swaney bound and gagged, sitting on the couch, crying. Cook told Matzke he had sodomized Swaney and that they had to kill him. Matzke said they tried to strangle Swaney with a sheet, but Matzke's end kept slipping out of his hands. Cook then reportedly stated "this one's mine," placed Swaney on the floor, and strangled him. He carried Swaney's body upstairs and put him in the closet with Cruz Ramos.

The autopsy revealed that Swaney's anus was dilated and semen was present, although the identity of the donor could not be ascertained. Matzke's fingerprints were found on the knife used to cut Cruz Ramos' chest, but no identifiable fingerprints were found on the metal pipe or wooden stick. Cook's fingerprints were found on the chair to which Cruz Ramos had been tied, the closet door, and the stapler. His semen was found on the strips that had been torn from his bedsheets. There was no other physical evidence of Cook's participation.

After Swaney's murder, Cook and Matzke fell asleep downstairs. Later in the day, Matzke went to work, but returned a few hours later after quitting his job at the restaurant. Late that evening, some friends came over to the apartment. Early in the morning of July 21, 1987, Matzke took one of the friends, Byron Watkins, outside of the apartment and told him about the murders. Watkins convinced Matzke to go to the police.

When Cook was arrested and brought to the station, he was questioned by Detective David Eaton of the Lake Havasu City Police Department. According to Eaton, he advised Cook of his *Miranda* rights, then asked him how the two bodies found in the apartment had gotten there. Cook replied that "we got to partying; things got out of hand; now two people are dead." When asked how they died, Cook said "my roommate killed one and I killed the other."

Cook was initially represented by appointed counsel. Prior to trial, Cook decided to waive his right to counsel and to represent himself. The trial judge strongly advised Cook against representing himself, enumerating the pitfalls he was likely to encounter. The trial court then accepted his waiver of counsel as knowingly, intelligently, and voluntarily given, and appointed Cook's former counsel to be his advisory

counsel. Also before trial, the trial court granted the state's motion to preclude all evidence of intoxication, and allowed the state to proceed on the theory that the murders were committed "knowingly." That is, the state would not have to prove that Cook acted intentionally in the murders of Cruz Ramos and Swaney, and therefore evidence of intoxication, which might negate intent but not knowledge, was precluded. *See* A.R.S. § 13-503.

The jury convicted Cook on both counts of first degree murder. At the sentencing hearing, Cook stated that the only penalty he would accept was death, and presented no mitigating evidence, though he did mention his lack of any other felony convictions. The state argued that the murder of Cruz Ramos was committed for pecuniary gain under A.R.S. § 13-703(F)(5), and that it was committed in an an especially cruel, heinous, and depraved manner under A.R.S. § 13-703(F)(6). The state also argued that Swaney's murder was especially cruel, heinous, and depraved. The court found these aggravating factors to exist and, *sua sponte,* found an additional aggravating factor in both murders—that they were committed during the commission of another homicide under A.R.S. § 13-703(F)(8). The trial court found no mitigating factors, and sentenced Cook to death on each count, with the proviso that if the sentences were reduced to life on appeal, they would run consecutively.

The clerk of the Mohave County Superior Court filed a timely notice of appeal on Cook's behalf. *See* Rule 31.2(b), Ariz. R.Crim.P., 17 A.R.S. (hereinafter Rule __). Cook claims the following errors on appeal:

1. He was denied his sixth amendment right to counsel when: (a) the trial court permitted him to waive his appointed counsel and proceed in *propria persona,* and (b) he was not permitted hybrid representation.

2. The trial court allowed the prosecution to convict Cook of first degree murder on the culpable mental state of "knowingly" rather than "intentionally," thus precluding evidence of voluntary intoxication.

3. The prosecutor impermissibly commented on Cook's invocation of his fifth amendment right not to testify.

4. The trial court dismissed a juror after evidence had been presented in the case, based on allegations stemming from the prosecutor's personal investigation of her out-of-court conduct.

5. The trial court denied Cook a fair trial by refusing to continue the trial to allow Cook to secure the testimony of certain witnesses.

6. The admission at trial of a statement made by Cook at his initial appearance violated his right to counsel.

7. Matzke was permitted to testify at trial under a plea agreement requiring him to testify consistently with prior testimony and statements to police.

8. The trial court refused to instruct the jury on second degree murder.

9. The trial court erred in finding as an aggravating circumstance that each homicide was committed during the commission of the other.

10. The trial court erred in finding as an aggravating circumstance that the murder of Carlos Cruz Ramos was committed in an especially "cruel, heinous and depraved" manner.

11. The trial court erred in finding as an aggravating circumstance that the murder of Carlos Cruz Ramos was committed in anticipation of pecuniary gain.

12. The trial court erred in finding as an aggravating circumstance that the murder of Kevin Swaney was committed in an especially "cruel, heinous and depraved" manner.

13. The trial court's pretrial order precluding evidence of voluntary intoxication denied Cook evidence of a mitigating circumstance.

14. The trial court erred in not considering Cook's history of neurological, mental, and psychiatric problems in its determination of mitigating factors.

15. The trial court erred in not considering as a mitigating factor the disparity between the sentence that Matzke received

**48**

under his plea agreement and Cook's possible death sentence.

16. Cook also argued that the Arizona death penalty statutes are unconstitutional on two grounds. First, the § 13–703(F)(6) aggravating factor of especially cruel, heinous, or depraved is unconstitutionally vague. Second, the statutory provisions governing the sentencing procedures in death penalty cases create an unconstitutional presumption or mandate of the death penalty.

In a recent decision upholding the constitutionality of Arizona's death penalty statute, the United States Supreme Court specifically rejected these two arguments. *Walton v. Arizona,* 497 U.S. 639, ——, 110 S.Ct. 3047, 3056–58, 111 L.Ed.2d 511 (1990). We, too, having recently considered these last arguments and discussed the application of *Walton,* conclude that Cook's contentions are without merit. *State v. Amaya–Ruiz,* 166 Ariz. 152, 175–77, 800 P.2d 1260, 1283–85 (1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991). Accordingly, we limit our discussion to claims of error one through fifteen.

## DISCUSSION

### I. Guilt/Innocence Issues

#### A. Self–Representation/Denial of Hybrid Representation

Cook claims that he was unconstitutionally permitted to waive counsel and to represent himself. The United States Supreme Court has held that a defendant has a constitutional right to waive his right to counsel and to proceed in *propria persona* as long as he is competent to waive the right and knowingly and voluntarily exercises the right. *Faretta v. California,* 422 U.S. 806, 834–36, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975).

■ When Cook moved to waive his defense counsel and proceed in *propria per-*

*sona,* the trial court cautioned him at length about the hazards of self-representation and described the problems Cook was likely to encounter. *See Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541 (defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' ") (quoting *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)). The trial court then carefully determined that Cook was competent to waive his counsel and that Cook's decision to do so was voluntary. On this record, we find no error. While Cook certainly lacked a lawyer's skills, the record demonstrates that he was intellectually competent, understood the trial process, and was capable of making—and did make—rational decisions in managing his case. This is all the competence that is required. *Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541 ("a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation.... The record affirmatively shows that [defendant] was literate, competent, and understanding, and that he was voluntarily exercising his informed free will").

■ Cook also claims that the trial court erred in denying him hybrid representation.[1] We disagree. Arizona does not recognize a right to hybrid representation. *State v. Rickman,* 148 Ariz. 499, 504, 715 P.2d 752, 757 (1986).

■ We also reject Cook's arguments that the judge unduly limited the participation of his advisory counsel, denied him lay assistance, and denied him in-court assistance from his court-appointed investigator. Before accepting Cook's motion to proceed in *propria persona,* the trial judge informed Cook that he would be appointed advisory counsel and explained to Cook what the role of advisory counsel encom-

---

1. Hybrid representation is the representation of a defendant both by himself *and* by counsel. Such representation is distinguished from advisory counsel, who gives a *pro per* defendant technical assistance in the courtroom but does

not participate in the actual conduct of the trial. *State v. Rickman,* 148 Ariz. 499, 504 n. 1, 715 P.2d 752, 757 n. 1 (1986). Cook was provided with advisory counsel.

passed. The judge reiterated this explanation in Cook's presence during jury selection. During the trial itself, when the judge expressed concern that Cook's advisory counsel may have been offering unsolicited advice—and so potentially infringing on Cook's right to self-representation—Cook explained to the judge that such advice was consistent with what Cook and advisory counsel had mutually arranged.

■ The judge was also correct in denying Cook's motion to have fellow prisoner Terry Holt, a "jailhouse lawyer," sit with Cook at the defense table as an "investigator." The judge determined that Cook wanted Holt to act as advisory counsel, and ruled that Cook already had advisory counsel and that in any case Holt was without authority to render official legal assistance.

B. Conviction on "Knowing" First Degree Murder and Preclusion of Evidence of Defendant's Intoxication

The state's pre-trial motions informed Cook and the court that the state would proceed at trial to prove a culpable mental state of "knowing," and not "intentional," first degree murder. *See* A.R.S. § 13–1105(A)(1). The state simultaneously moved to preclude evidence of Cook's intoxication that might otherwise have been relevant to disprove the culpable mental state of intent. The trial court granted the motion and ruled that neither the state nor the defense would be permitted to present evidence at trial of Cook's intoxication.

Cook now argues that the trial court erred in allowing the state to convict him of first degree murder under a mental state of only "knowingly" and not "intentionally." He contends that the court's ruling wrongfully denied him the opportunity to pursue the defense of voluntary intoxication at trial. He claims that such evidence should have been permitted because the jury was instructed on accomplice liability with respect to the murder of Cruz Ramos, which requires a finding of specific intent. He argues further that he was wrongfully precluded from introducing evidence of intoxication as a mitigating circumstance at the sentencing phase.

■ A person commits first degree murder if "[i]ntending or knowing that his conduct will cause death, such person causes the death of another with premeditation...." A.R.S. § 13–1105(A)(1). The language of the statute is clearly disjunctive, so a person may be guilty of first degree murder by causing the death of another with premeditation either intentionally *or* knowingly. *State v. Lavers*, 168 Ariz. 376, 389, 814 P.2d 333, 346, *cert. denied*, — U.S. —, 112 S.Ct. 343, 116 L.Ed.2d 282 (1991); *see also State v. Rankovich*, 159 Ariz. 116, 122, 765 P.2d 518, 524 (1988). Similarly, "[u]nder A.R.S. § 13–1101(1), a defendant premeditates his crime if he either *intends or knows* that his acts will kill another human being, and his *intention or knowledge* precedes the killing by a length of time to permit reflection." *Rankovich*, 159 Ariz. at 122, 765 P.2d at 524 (emphasis in original). In addition,

[a]lthough voluntary intoxication is not a defense to crime, our legislature permits juries to consider the fact that a defendant was intoxicated at the time of the criminal act, when determining the defendant's culpable mental state. However, the legislature allows such consideration only "when the actual existence of the culpable mental state of intentionally or with the intent to is a necessary element to constitute any particular species or degree of offense...." A.R.S. § 13–503.

\* \* \* \* \* \*

If a defendant is charged with knowingly committing first degree murder, the jury is not permitted to consider the "mental state of intentionally." ... Because the "mental state of intentionally" was not in issue, [defendant] was not entitled to a voluntary intoxication instruction under A.R.S. § 13–503.

*Id.; see also Lavers*, 168 Ariz. at 389, 814 P.2d at 346; *State v. Neal*, 143 Ariz. 93, 98, 692 P.2d 272, 277 (1984) ("even assuming [defendant] was intoxicated ... the jury could still properly convict him of first de-

gree murder if they believed he 'knowingly' caused the victim's death").

■ Whatever the merits of Cook's argument regarding the effect of intoxication on the culpable mental state of "knowing," we must reject his claim in the present case. At the hearing on the state's motion to proceed on a theory of "knowingly" and to preclude evidence of defendant's intoxication, the trial judge asked Cook whether he had any objection to an order precluding evidence of intoxication. Cook replied that he had none because it "basically does not even apply to my defense." Reporter's Transcript (R.T.) June 24, 1988, at 16. The court suggested to Cook ways in which such evidence might be relevant and explained to him what the consequences of preclusion would be. Cook reiterated that he had no objection. Further, Cook did not request the trial court to instruct the jury on voluntary intoxication. Cook waived any claim of error on appeal by failing to request a jury instruction at trial. Rule 21.3(c); *State v. Whittle*, 156 Ariz. 405, 408, 752 P.2d 494, 497 (1988).

■ The trial judge instructed the jury on accomplice liability under A.R.S. § 13–301, which requires the state to prove that the defendant acted with the intent to promote or facilitate the commission of an offense. Cook failed to object to the judge's jury instruction on accomplice liability. Thus, absent fundamental error, any argument that the judge should not have instructed the jury on accomplice liability because the state chose to proceed on a theory that Cook acted only "knowingly," and so should be precluded from convicting Cook as an accomplice, is waived. *State v. Schrock*, 149 Ariz. 433, 440, 719 P.2d 1049, 1056 (1986) ("The failure to object to an instruction either before or at the time it is given waives any error, absent fundamental error."). Because there was sufficient evidence before the jury to support its finding that Cook acted with the requisite intent to promote or facilitate the murder of Cruz Ramos, we find no fundamental error.

Finally, the trial judge's order precluding evidence of intoxication at trial applied only to the trial, and in no way precluded Cook from introducing evidence of intoxication to establish a mitigating factor at the sentencing hearing.

## C. References at Trial to Cook's Fifth Amendment Rights

Cook claims that the prosecutor impermissibly drew the jury's attention to his invocation of his fifth amendment privilege not to testify in his defense. In support of his claim, he points to the following excerpts from the prosecutor's closing arguments:

Perhaps most importantly from what Mr. Holt has to say ... is he helps him as a legal adviser. He files motions on his behalf; wants to be his investigator at trial to help him out there. They have these long conversations. They talk everyday [sic]. Never once was Terry Holt told by this man where he was. Never once does Dan Cook ... say I wasn't there because I was at McDonalds in Kingman or out of state or somewhere. Why was [Holt] never told where Dan Cook was?

\* \* \* \* \* \*

John Matzke doesn't have anything to hide. This man does.

How do we know that? Remember voir dire when we were selecting everybody? His left forearm has the tattoo of a dagger on it. He has covered that tattoo from the first day of the trial until today. He has had a large band-aid over that dagger. He covered that up. I suppose he didn't want you to think that he does have violent tendencies. If you saw that dagger on his forearm you could suppose that he did have such so he covered it up.

We wonder what else he covered up. But we don't have to wonder long. We don't have to wonder hard because he's done a poor job of covering everything else up.

\* \* \* \* \* \*

There were only four people there at that [sic] time of the deaths; two of them are

dead; one is in prison; one is the Defendant.

R.T. July 6, 1988, at 78–79, 84.

▇ Cook did not object to these comments at trial. "Opposing counsel must timely object to any erroneous or improper statements made during closing argument or waive his right to the objection, except for fundamental error." *State v. Smith,* 138 Ariz. 79, 83, 673 P.2d 17, 21 (1983), *cert. denied,* 465 U.S. 1074, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984). Consequently, Cook may be entitled to relief only if the prosecutor's comments rise to the level of fundamental error.

▇ We have previously explained that, in general,

it is constitutional error for the prosecution to comment on the defendant's decision not to testify in his own defense. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Arizona also has a statute precluding such comment. A.R.S. § 13–117(B) (formerly § 13–163(B)).

However, to be impermissible, the prosecutor's comments must be calculated to direct the jurors' attention to the defendant's exercise of his fifth amendment privilege.

*State v. McCutcheon,* 159 Ariz. 44, 45, 764 P.2d 1103, 1104 (1988). Such "statements must be examined in context to determine whether the jury would naturally and necessarily perceive them to be a comment on the failure of the defendant to testify." *Schrock,* 149 Ariz. at 438, 719 P.2d at 1054; *see also State v. Decello,* 113 Ariz. 255, 258, 550 P.2d 633, 636 (1976) (prosecutor's comment, "no one, no one, no one got up on this stand and testified to you contrary," held to be fundamental error); *State v. Rhodes,* 110 Ariz. 237, 238, 517 P.2d 507, 508 (1973) (prosecutor's comment, "that [defendant] did not have to explain away, or that [defendant] did not explain away off of that witness stand," held improper) (emphasis omitted).

Considered in the appropriate context, the prosecutor's comment regarding Cook's conversations with Terry Holt was not a comment on Cook's failure to testify or his invocation of his right to remain silent. Cook had listed alibi as one of his defenses, and the prosecutor's statement implies that if Cook had an alibi, he would have mentioned it in his allegedly frequent conversations with Holt. *See Schrock,* 149 Ariz. at 439, 719 P.2d at 1055 (prosecutor's comment that defendant had no alibi did not create an impermissible inference, but "related only to the fact that the defendant in his statements to the officers did not support the alibi defense defendant had pled"). The prosecutor did not insinuate that Cook had failed to provide an alibi because he had not testified at trial. *Cf. State v. Cannon,* 118 Ariz. 273, 274, 576 P.2d 132, 133 (1978) (fundamental error for prosecutor to comment in argument that the one question the jury should focus on was where the defendant was, which *"was never answered by the defendant"*) (emphasis in original). Because the prosecutor's comment was not directed at the fact that Cook did not testify, Cook was not denied a fair trial.

Nor did the prosecutor's comments regarding Cook's tattoo violate Cook's fifth amendment rights. The comments were part of a rhetorical argument suggesting that Cook had tried to cover up his participation in the murder. There is nothing to suggest that these comments referred to the fact that Cook did not testify or that they were calculated to draw the jury's attention to that fact. Cook's reliance on *State v. Ballantyne,* 128 Ariz. 68, 623 P.2d 857 (Ct.App.1981), is misplaced. In *Ballantyne,* the defendant's conviction was reversed because the prosecutor's references to a tattoo during cross-examination and rebuttal were irrelevant and highly prejudicial attempts to prove defendant's bad character and implied the existence of an unsubstantiated and prejudicial factual predicate. The defendant in *Ballantyne* testified at trial, so the court did not face the issue of improper references to the defendant's fifth amendment rights.

▇ The final comment to which Cook ascribes error arose as a consequence of Cook's attempt to discredit testimony regarding a statement he made to the police.

In cross-examining Detective Eaton, Cook attempted to cast doubt on his alleged inculpatory statement by asking why other witnesses' *Miranda* waivers and statements were recorded, but Cook's alleged inculpatory statement was not:

Q. Sir, is it true that everybody else that was interviewed by you was recorded in some way other than myself?

A. We recorded Mr. Matzke. At the conclusion of my interview with you, you requested not to be recorded because you didn't want to make a statement. We had the tape playing so we recorded Mr. Watkins.

Q. But you didn't record me; is that correct?

A. That's correct. You invoked your right to remain silent and I terminated the interview.

R.T. June 30, 1988, at 120.

Cook immediately objected. After completing his cross-examination, Cook requested that the court declare a mistrial because Eaton had referred to Cook's invocation of his right to remain silent. The court denied the request, stating that the testimony was in response to the line of questioning that Cook had been pursuing for over twenty minutes.

Later, during the prosecutor's rebuttal argument, the prosecutor made reference to Eaton's testimony:

And what about the videotape. John Matzke made one and we heard continuous cross-examination of the detective about why the Defendant didn't make one. He didn't make one because he, the Defendant, was the one that cut off the interview. If he had made one, you would have had the statements we got to partying a little bit and things got out of hand. My roommate killed one and I killed the other. I killed Kevin. You would have heard the exact same statements.

R.T. July 6, 1988, at 84. Cook objected to this comment and, after the arguments were concluded, again moved for a mistrial. The court denied his motion for the same reason it had denied his previous request for a mistrial. The court explained that

once the testimony came in, the prosecutor was justified in referring to it in his argument.

We agree with the trial court that any error occasioned by Detective Eaton and the prosecutor's comments was invited by Cook's strategy in questioning why his interview had not been taped. In *State v. Arredondo*, 111 Ariz. 141, 144, 526 P.2d 163, 166 (1974), we held that remarks by the prosecutor that normally would have been fundamental error were "invited and occasioned by the statements of defense counsel; hence they are not grounds for reversal." Here, after demonstrating self-restraint that the trial court found remarkable given Cook's questions, Detective Eaton finally explained that Cook did not make a taped statement because Cook himself terminated the interview. Later, to counter Cook's strategy of insinuating that his statement had been coerced or fabricated because it had not been videotaped, the prosecutor explained in his rebuttal argument why no videotape had been made. The prosecutor's point was simply that the fact that Cook's admission had not been videotaped ought not dampen its inculpatory impact.

We hold, therefore, that neither Detective Eaton nor the prosecutor violated Cook's fifth amendment rights because their responses were reasonable and pertinent given Cook's entire line of questioning. See *State v. Christensen*, 129 Ariz. 32, 39, 628 P.2d 580, 587 (1981) ("the remark of the prosecution did not go beyond a pertinent reply and was not reversible error").

### D. Dismissal of Juror

After the state had begun to present its evidence, the court granted a motion by the prosecutor to excuse a juror for cause. In making his motion, the prosecutor informed the court that a juror had attempted to speak with him and

has spoken at length in detail with her co-workers concerning the goings on at the trial which she has witnessed. She has also made representatives [sic] as to her opinion as to the guilt or innocence of

Mr. Cook.... Based on that, I believe we have a problem with [the juror]. She is incapable of following your admonitions.

R.T. July 5, 1988, at 7.[2]

The trial judge then interviewed the juror on the record with Cook and the prosecutor present. When asked if there was something she had wanted to communicate to the prosecutor, she explained that she had approached him and "asked him if it was proper for me to speak with him. He said no so then I was going to wait and see and speak with you a little later." She said that a few days earlier, on July 1 (while the court was in recess), the prosecutor had called her office and spoken to her co-workers. She admitted that there had been comments made about the trial between her and co-workers, but denied talking about the trial testimony. She said that she had told her co-workers that she "didn't think it was a well-organized trial and ... some of the witnesses looked— well, made themselves look as if [they] didn't know what they were talking about." She also said that her "co-workers would say did you hang him yet and I would say no...." She told the trial judge that "if you feel that I should be disqualified because of that, I'm willing to be disqualified because I don't care for my co-workers to be harassed on the job [by the prosecutor]." She also told him that she had formed no opinion as to Cook's guilt or innocence, and denied having said anything to her co-workers that could have been taken to mean that she had.

When questioned by the prosecutor, she admitted having been asked by co-workers whether the photographs and videotape

shown at trial had made her sick and having responded that they had not. She also admitted having said that the victims looked in the photographs like they were asleep, but denied having gone into any detail.

Cook argued at trial that the juror should not be dismissed because the only basis for excusing her was the prosecutor's own statements, and the juror had denied the prosecutor's allegations. The judge nevertheless excused her from the jury, finding that "even though at least as far as her description of it, it perhaps sounds innocuous," it was clear that she had disobeyed his admonitions. Fourteen jurors had originally been seated to hear the trial, and one had already been excused, so when the challenged juror was excused the trial proceeded with the remaining twelve jurors.

Cook claims on appeal that the dismissal of the juror denied him the "right to a fair trial by jury." Cook did not move for a mistrial, nor did he claim error on this ground in his motion for a new trial.[3]

■ Under the Arizona Rules of Criminal Procedure,

[w]hen there is reasonable ground to believe that a juror cannot render a fair and impartial verdict, the court, on its own initiative, or on motion of any party, shall excuse him from service in the case. A challenge for cause may be made at any time....

Rule 18.4(b).[4] Challenges for cause are permitted even after the jury has begun to hear evidence. *State v. Evans*, 125 Ariz. 140, 142, 608 P.2d 77, 79 (Ct.App.1980).

---

2. The judge later asked the prosecutor "out of curiosity" how the matter had come to his attention. The prosecutor explained that the wife of one of the juror's co-workers at the Bureau of Land Management worked for Mohave County; she informed a deputy county attorney, who in turn relayed the information to him.

3. One of Cook's grounds for a new trial was that the "prosecution is guilty of misconduct, by mingling with the jurors." At a hearing on Cook's motion, the trial court ruled that there was no evidence before him that the prosecutor had mingled with the jurors.

4. An earlier version of this rule, contained in the 1956 Arizona Rules of Criminal Procedure, contained a catalogue of fifteen grounds for dismissing a juror for cause. As the official comments to the current Rule 18.4(b) explain,

[t]he omission of the list is intended to direct the attention of attorneys and judges to the essential question—whether a juror can try a case fairly. A challenge for cause can be based on a showing of facts from which an ordinary person would imply a likelihood of predisposition in favor of one of the parties.

Determining whether there are reasonable grounds to believe that a juror cannot render a fair and impartial verdict is within the discretion of the trial judge. Only the trial judge has the opportunity to observe the juror's demeanor and the tenor of his or her answers first hand. Consequently, we will not disturb the decision of the trial court on appeal unless there is a clear showing that the court abused its discretion. *State v. Chaney*, 141 Ariz. 295, 303, 686 P.2d 1265, 1273 (1984).

We find no abuse of discretion. While the circumstances through which this matter was brought to the court's attention were irregular, it was reasonable for the trial judge to determine that the juror's ability to render a fair and impartial verdict had become suspect. She admitted to the judge that she had commented on the trial with her co-workers despite the judge's clear admonitions not to discuss the case with outsiders. We recognize that some discussion by jurors of their pending cases may be inevitable. *See Bruce v. Duckworth*, 659 F.2d 776, 781 (7th Cir.1981) ("It is unrealistic and impossible to expect or require that a jury be a laboratory completely sterilized and freed from all external factors."), *cert. denied*, 455 U.S. 955, 102 S.Ct. 1464, 71 L.Ed.2d 673 (1982). Nevertheless, the trial court had evidence of specific violations of its admonitions to the jurors. These violations went beyond casual utterances regarding, for example, the length of the trial or similar matters, but instead concerned the conduct of witnesses and the content of specific exhibits. The court did not abuse its discretion in determining that there was cause to strike the juror for violation of its admonition. *See Buchanan v. State*, 263 Ind. 360, 332 N.E.2d 213, 218 (1975) (juror who admitted violating court's admonition about discussing the case dismissed over defendant's objection). *See generally* 50 C.J.S. *Juries* § 290 (1947 & Supp.1991).

We are aware that there was a high probability that the juror in question would have been one of the jurors that deliberat-

ed Cook's verdict had she not been excused.[5] We are also aware that the prosecutor may have been motivated to seek the juror's dismissal at least in part because she had expressed a negative opinion about the presentation of the state's case. In certain circumstances there may be constitutional constraints on the trial court's exercise of discretion regarding whether to excuse a juror for cause, particularly when a juror has indicated that, from the evidence heard, he or she might be disinclined to vote for a conviction. *See United States v. Brown*, 823 F.2d 591, 596–97 (D.C.Cir. 1987) (reversal required under constitutional right to unanimous jury verdict when juror requested to be and was dismissed after deliberations had begun because the request may have stemmed from juror's belief that evidence was insufficient to support a conviction). In other circumstances, when there is no basis for the trial court's dismissal for cause, it may be prejudicial error requiring reversal to dismiss a juror who has disclosed opposition to a verdict sought by the prosecution. *People v. Hamilton*, 60 Cal.2d 105, 32 Cal.Rptr. 4, 16–17, 383 P.2d 412, 424–25 (1963).

We need not adopt or reject these opinions from other jurisdictions because Cook's case can be distinguished. In *Hamilton*, the reviewing court found that the trial court had erred in dismissing a juror because there was no factual basis to support the reason given by the trial court for the dismissal. The reviewing court went on to address the fact that the juror had expressed ostensible opposition to the verdict sought by the state in order to determine whether the trial judge's error was prejudicial. Here, in contrast, we have held that, given the facts before the trial court, the judge acted within his discretion in excusing the juror for violating his admonition. Because we have found no error, there is no issue of prejudice.

In *Brown*, the juror asked to be dismissed after the jury had begun deliberating, and not because he had violated the

---

5. Before the juror was excused, there had been thirteen jurors hearing the case. Because the alternate was to be selected by lot pursuant to

Rule 18.5(h), there was a 12 in 13 chance that some other juror would have been the one excused before deliberations began.

trial judge's admonitions but rat her because he felt he could not exercise his duty as an impartial juror. The record indicated that there was a "substantial possibility" that the juror "requested to be discharged because he believed that the evidence offered at trial was inadequate to support a conviction." 823 F.2d at 596. Here, however, the juror told the judge that she had not yet formed any opinion as to Cook's guilt or innocence. *Cf. Hamilton*, 32 Cal. Rptr. at 17, 383 P.2d at 425 (to excuse juror who had expressly indicated she was disinclined to render verdict sought by the state was "tantamount to 'loading' the jury").

▮ The fact that we find no error does not excuse the conduct of the prosecutor. What happened in this case serves as a clear illustration of why, in most circumstances, the proper procedure upon becoming aware of possible juror misconduct is to inform the court as soon as possible and let the court conduct whatever investigation it deems warranted. *Cf. State v. Cady*, 248 Kan. 743, 811 P.2d 1130, 1140 (1991) ("The State's failure immediately to report to the court and to [defense] counsel the possibility of a juror's misconduct casts dark shadows upon the Fourteenth Amendment's guarantees of due process and the fundamental right to a fair trial.").

Regardless of what the juror had actually said or done, and regardless of the source and reliability of the prosecutor's information, by conducting an investigation involving personal contacts with the juror's co-workers, the prosecutor created a situation in which it was only natural for the juror to "have at least an inhospitable attitude toward Counsel for the State." R.T. July 5, 1988, at 14. Had the court been given an opportunity to conduct its own inquiry, it might have discreetly excused the juror, or determined that the she was still fair and impartial and able to continue on the case. *See Cady*, 811 P.2d at 1141 ("If the prosecution had immediately reported the incident to the trial judge, the judge could have taken remedial action prior to discharging the alternate jurors.").

▮ Once the prosecutor had alienated the juror through his unauthorized investigation, the court's only realistic choices were to declare a mistrial or excuse the juror, neither of which is an ideal result.[6] Furthermore, by conducting his own investigation of the juror, and then contradicting her sworn testimony before the judge based on his personal knowledge, the prosecutor effectively made himself a witness in the case.[7] *See* ER 3.7, Rule 42, Ariz. R.Sup.Ct., 17A A.R.S. Finally, regardless of whether it was ultimately appropriate for the trial judge to excuse the juror, we believe that the judge himself should have identified and criticized the irregularity of the prosecutor's conduct in conducting his investigation and at the hearing. Hopefully he did so, although such action does not appear on the record.

### E. Denial of Continuances

▮ Cook claims that the trial court deprived him of a fair trial by refusing to continue the trial to provide him with the opportunity to secure the testimony of two witnesses, Brian Galvin and James Dominic. Grant of a motion to continue "is with-

---

6. Cook did not move for a mistrial when the juror was excused, so we need not and do not decide whether the court would have erred in denying such a motion. Having failed to move for a mistrial, and having thereby gambled on the results of the verdict from the twelve remaining jurors, Cook cannot claim the court erred in not granting a mistrial or in abridging his right to have the trial concluded before the jury that would, to a 12/13 probability, have included the juror that was excused. *See ante* note 5.

The prosecutor is nevertheless fortunate that reasonable grounds (outside of the juror's alleged antipathy toward him) were present to excuse the juror, for otherwise his conduct might have resulted not only in a mistrial, but in a double jeopardy bar to a new trial. *See* comment to Rule 18.4(b); *Evans v. Abbey*, 130 Ariz. 157, 634 P.2d 969 (Ct.App.1981); *Pool v. Superior Court*, 139 Ariz. 98, 677 P.2d 261 (1984).

7. During his examination of the juror, the prosecutor stated: "Your Honor, *I would avow* to the Court [the juror's co-worker] gave me a fairly detailed description of the videotape, [sic] of the walk-through and he claimed he had gotten that through conversation with [the juror]." R.T. July 5, 1988, at 13 (emphasis added).

in the discretion of the trial court, and its decision will only be disturbed upon a showing of a clear abuse of such discretion and prejudice to the defendant." *Amaya–Ruiz*, 166 Ariz. at 164, 800 P.2d at 1272.

In a hearing on his motion for a continuance, Cook asserted that Galvin would testify to Matzke's past and to the circumstances of the murders. The court stated its assumption—which Cook did not challenge—that the purpose of the testimony would be to show that Matzke was a homosexual and had engaged in various homosexual activities in the past, and that at some time in the past Matzke had beaten a victim with a club. The judge refused to grant a continuance because he believed that Galvin's testimony would be cumulative since these facts could be established by other witnesses, including Matzke himself.

During the trial, Cook informed the court that he wanted to call Dominic to the stand, but that he and his investigator had not yet been able to contact and interview him. Cook said that Dominic would testify to the character of Matzke, Cruz Ramos, and Swaney, and that he believed his investigator was currently conducting the interview. The court did not believe that Cook's offer of proof contained relevant information regarding Cruz Ramos or Swaney, but believed that further impeachment of Matzke would be cumulative and would "pale in comparison" to what Matzke himself had already admitted in court. The court therefore ruled that it would not continue the trial to wait for Dominic's possible testimony. The court did, however, agree not to rule out the possibility that Cook might be allowed to reopen his case and present Dominic's testimony should the interview produce relevant and significant information, but Cook did not thereafter renew his request to call Dominic to the stand.

The trial judge thoroughly considered the circumstances of the requests before determining that the testimony Cook sought to secure would be irrelevant or cumulative. The court had already granted eight defense motions for continuances, including one made by Cook himself after taking over his own defense. Cook has not demonstrated any prejudice stemming from the trial court's rulings. Matzke did, in fact, admit on the stand the facts that Cook had stated he intended to establish through the unavailable witnesses.[8] Nor did Cook inform the court whether his investigator had been able to locate Dominic, or whether Dominic had any relevant testimony to add. We therefore find that the trial court did not abuse its discretion in denying Cook's requests for continuances.

### F. *Edwards* Claim

■ At the initial appearance before the Lakew Havasu City Justice Court on July 21, 1987, the judge appointed an attorney for Cook. At the conclusion of the hearing, the judge asked Cook if he had any questions. According to Officer Richard Funder of the Lake Havasu City Police Department, Cook responded "if I'm found guilty of this, I want the death penalty." Prior to trial, Cook moved to suppress his statement, arguing that it was obtained in violation of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The trial court denied Cook's motion, finding that although Cook was in custody, he was not being interrogated at the time he made the statement, and that his statement was voluntary. Testimony about Cook's statement was ultimately admitted at trial.

The trial court was correct in ruling that the Lake Havasu City Court judge did not interrogate Cook when he asked Cook if he had any more questions. Because Cook's statement did not result from a custodial interrogation, his *Edwards* rights were not violated. *Id.* at 486–87, 101 S.Ct. at 1885 (citing *Rhode Island v. Innis*, 446 U.S. 291, 298 n. 2, 100 S.Ct. 1682, 1688 n. 2, 64 L.Ed.2d 297 (1980)).

---

**8.** Matzke took the stand at trial and admitted his participation in the killings and in the torture of Cruz Ramos. He further admitted having had homosexual relationships, having hit a fellow student in the head with a hockey stick in eighth grade, and having previously undergone substance abuse counseling.

■ Cook also challenges the admission of his statement on relevance grounds. He argues that the statement was admitted in contravention of the court's order precluding reference to the possible punishment.[9] Cook made no objection when Officer Funder testified to his statement at trial. Because Cook did not object, the trial judge had no opportunity to consider the testimony in relation to the order in limine regarding references to punishment or to conduct a Rule 403 hearing.

Ordinarily, absent fundamental error, objection for the first time on appeal is waived; however, "where a motion in limine is made and ruled upon, the objection raised in that motion is preserved for appeal, despite the absence of a specific objection at trial." *State v. Burton*, 144 Ariz. 248, 250, 697 P.2d 331, 333 (1985). Cook did not raise the issue of relevance in his written motion in limine, but at the hearing on the motion he did argue that the statement was irrelevant because the jury was not to take into consideration any comments about the possible penalty he might face if convicted.[10] The issue of the statement's relevance was thus arguably preserved for appeal, and we therefore address the merits of Cook's claim.

■ Cook's statement would be irrelevant if offered to suggest to the jury that he might face the death penalty if convicted. There is, however, another plausible purpose for the statement: the statement could reasonably be interpreted as evidence of a guilty mind, and would as such be relevant on the issue of guilt. "For Rule 401 purposes, evidence is relevant if it has any tendency to make the existence of any fact that is of consequence more or less probable than it would be without the evidence." *State v. Oliver*, 158 Ariz. 22, 28, 760 P.2d 1071, 1077 (1988). If the jury believed the statement to be evidence of Cook's culpable mental state, its probative value would outweigh any unfair prejudice to Cook from having the death penalty merely mentioned in front of the jury. The problem here was one of interpretation, a matter within the province of the jury, and we believe the trial judge did not abuse his discretion by allowing the jury to consider the statement.

### G. Matzke's Plea Agreement

Cook claims that the terms of the plea bargain through which the state secured Matzke's testimony against him violated his due process and confrontation rights under the state and federal constitutions. On October 30, 1987, Matzke agreed to plead guilty to one count of second degree murder and to testify against Cook. In return, the state dropped the first degree murder charges against him. The plea agreement contained the following provision:

> John Eugene Matzke will, during such interviews and during such testimony, provide truthful responses to any questions put to him and will not knowingly make any false or misleading statements. *The making by John Eugene Matzke of two or more statements during such testimony or interviews which are inconsistent, so that at least one of them must be false, will be considered a violation of this Agreement without the State being required to establish which statement was false.*

(Emphasis added.)

Cook does not, and cannot, challenge the requirement that Matzke testify fully and truthfully. Rather, Cook argues that the state improperly influenced Matzke to testify against him. The essence of Cook's argument is that Matzke's trial testimony was wrongly coerced because his plea agreement was conditioned on his testimony being *consistent* with prior statements he had made to the police and prosecution.

---

9. Cook's motion to suppress the statement and the state's motion in limine regarding references to punishment were argued at the same evidentiary hearing. The motion to suppress was argued first, so at the time that motion was denied, the court had not yet ruled on the motion in limine.

10. The trial judge did not expressly rule on the relevance challenge, but simply denied the suppression motion.

If he violated the condition, his plea bargain could be rescinded and first degree murder charges reinstated against him. Matzke had already made a videotaped confession to the police, and if the charges were reinstated he would face, as he was told by the judge who had accepted his guilty plea, "an almost certain death penalty."

We faced a plea bargain raising similar concerns in *State v. Fisher*, 141 Ariz. 227, 686 P.2d 750, *cert. denied*, 469 U.S. 1066, 105 S.Ct. 548, 83 L.Ed.2d 436 (1984). *Fisher* concerned whether a witness was improperly motivated to assert the fifth amendment and refuse to testify at trial to secure the benefits of a plea agreement. That plea agreement contained a provision that "if she is called as a witness ... and required to testify, her testimony will not vary substantially in relevant areas to statements previously given...." *Id.* 141 Ariz. at 244, 686 P.2d at 767. This court remarked that the plea agreement was "unusual, if not unethical," but held that the witness' decision to assert the fifth amendment was not necessarily motivated by the plea agreement. We noted that

> [t]hough we need not determine the validity of this agreement, we do question its propriety. We recognize the benefits to be gained from granting a defendant immunity in exchange for truthful testimony, and for granting plea bargains in the interest of judicial economy.... [Citation omitted.] The instant case involves more than that. The prosecution did not condition conviction for a lesser offense on a defendant's promise to tell the truth. Instead, the prosecution conditioned conviction for a lesser offense on a defendant's promise to be *consistent.* By doing so, the prosecution may have overstepped the bounds of the law and its ethical responsibility to "scrupulously avoid any suggestion calculated to induce the witness to suppress or deviate from the truth, or in any degree to affect his free and untrammeled conduct when appearing at the trial or on the witness stand." A.B.A. Canons of Professional Ethics 39. We remind the prosecution that a public prosecutor's duty is "to seek justice, not merely to convict" and that a public prosecutor should not intentionally avoid pursuit of evidence merely because he believes it will damage his case or aid the accused. A.B.A. Model Code of Professional Responsibility, Ethical Consideration 7–13.

141 Ariz. at 244 n. 5, 686 P.2d at 767 n. 5 (emphasis added).

█ Cook made no pre-trial motion to suppress Matzke's testimony. Nor did he object when Matzke was called to testify at trial or when Matzke's testimony revealed the terms of his plea agreement. Absent fundamental error, Cook thus waived any claim that the trial judge erred in failing to suppress Matzke's testimony because of the offending provision in the plea agreement. Further, the trial judge, having heard no objection on this issue, had no occasion to develop a record or issue an appropriate remedial order.

█ The record in this case is inadequate to permit us to determine as a factual matter whether Matzke's plea agreement was such that his testimony was coerced, thus denying Cook a fair trial. Matzke testified at trial that his plea agreement provided that "[i]f I change my testimony or deviate from what it was before, I be held [sic] in perjury and plea can be denied," but he also testified that he had agreed "to tell the truth about what happened that night." R.T. June 28, 1988, at 18, 52.

We have previously suggested that this court is not the appropriate forum in which to raise for the first time a claim of ineffective assistance of counsel because such a determination requires an examination of the record as a whole to establish the reasons behind counsel's actions or inactions. *See State v. Valdez*, 160 Ariz. 9, 14–15, 770 P.2d 313, 318–19 (1989). It is likewise inappropriate for us to consider the fundamental error issue that Cook raises for the first time here; the trial court has not had the opportunity to conduct an evidentiary hearing on the question and to develop a record on the issue for us to examine on appeal. The preferred procedure is for Cook to

raise the issue of whether Matzke's testimony was impermissibly coerced because of the plea agreement in a proceeding for post-conviction relief. *See id.* at 15, 770 P.2d at 319. Our ruling here does not foreclose this possibility.

We recognize that there is a line of cases holding that when an accomplice testifies under an agreement containing a provision conditioning the agreement on testimony consistent with prior statements, the testimony is so tainted that its admission violates the defendant's right to a fair trial. *E.g., People v. Medina,* 41 Cal.App.3d 438, 116 Cal.Rptr. 133 (1974). *Cf. United States v. Dailey,* 759 F.2d 192 (1st Cir. 1985); *Humboldt County Sheriff v. Acuna,* 107 Nev. 664, 819 P.2d 197 (1991) (so long as plea agreement is not contingent upon state obtaining a conviction, and testimony is not scripted, due process is not violated, and existence of plea bargain goes to weight rather than admissibility of evidence). Because we are unable to address the merits of Cook's position on the record before us, we do not decide whether to adopt the rationale of *Medina, Dailey, Acuna,* or another position. We adhere, however, to our view of the ethical problems inherent in contingent plea agreements that we elaborated in *Fisher.* We are constrained merely to comment that we consider it strange that such an agreement be made three years after *Fisher's* warning about the use of such agreements and that counsel failed to call the issue to the court's attention.

## H. Denial of Instruction on Second Degree Murder

Cook requested that the trial court instruct the jury on second degree murder. He claims the court erred in refusing the instruction.

■ "In capital cases, the trial judge must instruct" the jury on all "those lesser included offenses that the evidence will support." *State v. Clabourne,* 142 Ariz. 335, 345, 690 P.2d 54, 64 (1984); *see also Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); *State v. Schad,* 163 Ariz. 411, 417, 788 P.2d 1162,

1168 (1989), *aff'd,* — U.S. —, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). On the other hand, "the trial judge need not instruct" the jury on "lesser included offenses which are not supported by the evidence." *Clabourne,* 142 Ariz. at 345, 690 P.2d at 64. "To warrant the charge of second degree murder, the evidence reasonably construed must tend to show a lack of premeditation and deliberation. *'The presence of such evidence* is the determinative factor.' " *Id.* (quoting *State v. Sorensen,* 104 Ariz. 503, 507, 455 P.2d 981, 985 (1969)) (emphasis in original); *see also Schmuck v. United States,* 489 U.S. 705, 716 n. 8, 109 S.Ct. 1443, 1450 n. 8, 103 L.Ed.2d 734 (1989) (Supreme Court's decision in *Schmuck* "in no way alters the independent prerequisite for a lesser included offense instruction that the evidence at trial must be such that a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater").

In this case, the trial court refused Cook's proposed instruction on second degree murder because the court did not see "any basis upon which the jury could feel that the Defendant committed these murders without premeditation." Matzke's testimony at trial indicated that he and Cook had discussed killing Cruz Ramos and had decided to kill him at least thirty minutes before they actually committed the murder. In addition, Cruz Ramos died from strangulation, and Matzke's testimony further indicated that, because of several unsuccessful attempts, fifteen minutes passed between the time that the attempt to murder Cruz Ramos began and the time that Cruz Ramos appeared to die. Swaney also died from strangulation. Matzke testified that he and Cook tried to strangle Swaney with a sheet, and when they failed Cook said "this one's mine" and proceeded to kill Swaney. There was no evidence that these murders were committed in the heat of passion or as the result of a quarrel. *See* A.R.S. § 13–1101(1). The record supports the trial court's finding that there was no basis for a jury to find that the murders were committed without premeditation, and we will not disturb that finding.

Cook also argued at trial, and argues again on appeal, that he was entitled to a jury instruction on second degree murder because Matzke was permitted to plead guilty to second degree murder. Cook contends that under Rules 17.3 and 26.2(c) the judge was required to establish that there was a factual basis for Matzke's plea before accepting it; therefore, there must also have been facts warranting an instruction on second degree murder for Cook. Despite its syllogistic appeal, we reject this argument. The fact that a judge accepted Matzke's guilty plea to a charge that did not include an element of premeditation is irrelevant. The overwhelming evidence before the court at trial was that Cook either killed with premeditation or not at all. The trial court did not err in refusing to instruct the jury on second degree murder.

## II. Death Penalty Issues

Whenever the trial court imposes the death penalty, we review the record and make a separate and independent determination of whether the death sentence is appropriate. *State v. McMurtrey* (*McMurtrey I*), 136 Ariz. 93, 101, 664 P.2d 637, 645, *cert. denied*, 464 U.S. 858, 104 S.Ct. 180, 78 L.Ed.2d 161 (1983). We do this by reviewing the aggravating and mitigating circumstances found by the trial court to ensure that they were properly determined and weighed. *State v. Richmond*, 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977).

## A. Aggravation/Mitigation Issues

The trial judge held an aggravation/mitigation hearing, and returned a special verdict pursuant to A.R.S. § 13–703(F). He found the following aggravating circumstances to apply to the murders of both Cruz Ramos and Swaney: (1) each murder was committed in an especially cruel, heinous, and depraved manner under § 13–703(F)(6); and (2) Cook was convicted of another homicide committed during the commission of each murder under § 13–703(F)(8). He also found that the murder of Cruz Ramos was committed in expectation of pecuniary gain under § 13–

703(F)(5). The trial judge found no mitigating factors, and therefore sentenced Cook to death on both counts of first degree murder.

### 1. *Aggravating Circumstances*

### a. Especially Cruel, Heinous, or Depraved

Cook argues that the trial court erred in finding that the murder of Cruz Ramos was especially cruel, heinous, or depraved because it was Matzke, not Cook, who actually killed the victim. Although Cook was not convicted of felony murder, the trial court nevertheless made an *Enmund/Tison* finding that Cook's involvement in the murder was sufficient to warrant a possible death sentence. *See Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). While Matzke ultimately succeeded in strangling Cruz Ramos by himself, he did so only after he had been unable to do so with Cook's assistance in pushing the pipe against Cruz Ramos' throat. The record clearly supports the trial court's finding that Cook assisted in the murder of Cruz Ramos. *See State v. Correll*, 148 Ariz. 468, 477–78, 715 P.2d 721, 730–31 (1986) (defendant helped bind victims, drove them into desert, and encouraged actual killer to kill one victim).

Next, we must determine whether the trial judge properly determined that the murders were especially cruel, heinous, or depraved. "The terms 'cruel, heinous, or depraved' are considered disjunctively; a finding of any one of the three constitutes an aggravating circumstance under our statute." *Amaya–Ruiz*, 166 Ariz. at 177, 800 P.2d at 1285. "To support a finding of cruelty, the state must prove beyond a reasonable doubt that the victim was conscious and suffered pain or distress at the time of the offense." *State v. Jimenez*, 165 Ariz. 444, 453, 799 P.2d 785, 794 (1990) (citing *State v. Villafuerte*, 142 Ariz. 323, 690 P.2d 42 (1984), *cert. denied*, 469 U.S. 1230, 105 S.Ct. 1234, 84 L.Ed.2d 371 (1985)). The facts recounted at the beginning of

this opinion leave no doubt that the killings were "cruel" as we have defined the term.

"The terms 'heinous' and 'depraved' focus upon a defendant's state of mind at the time of the offense." *Amaya–Ruiz*, 166 Ariz. at 178, 800 P.2d at 1286. An especially heinous murder is one "that is 'hatefully or shockingly evil,' " and a "murder is depraved if 'marked by debasement, corruption, perversion or deterioration.' " *Id.* (quoting *State v. Knapp*, 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978)). The facts of these killings provide a clear example of what we meant in *Knapp*.

We have set forth five factors to be considered in determining whether a defendant's conduct was especially heinous or depraved:

    1. the relishing of the murder by the defendant;

    2. the infliction of gratuitous violence on the victim beyond that necessary to kill;

    3. mutilation of the victim's body;

    4. the senselessness of the crime; and

    5. the helplessness of the victim.

*Amaya–Ruiz*, 166 Ariz. at 178, 800 P.2d at 1286 (quoting *State v. Gretzler*, 135 Ariz. 42, 51–52, 659 P.2d 1, 10–11, *cert. denied*, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983)). Again, the facts of these killings fit within the factors enumerated.

The trial court found, and we agree, that both murders were so especially cruel, heinous, and depraved that it was needless to belabor the issue. There is no doubt in our minds that each of these crimes of brutal and senseless torture, sodomy, and murder falls clearly within § 13–703(F)(6), if not at the extreme end of the spectrum.

b. Expectation of Pecuniary Gain

   ■ The trial court found that Cook murdered Cruz Ramos in expectation of pecuniary gain under A.R.S. § 13–703(F)(5). The court made an analogy to cases in which murder was committed "to successfully complete or to get away with the robbery." In *State v. LaGrand*, 153 Ariz.

21, 35, 734 P.2d 563, 577, *cert. denied*, 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987), we explained that "the state must show the actor's *motivation* was the expectation of pecuniary gain," and that "[p]ecuniary consideration must be a cause of the murder, not merely a result" (quoting *State v. Carriger*, 143 Ariz. 142, 161, 692 P.2d 991, 1010 (1984), *cert. denied*, 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 864 (1985); *State v. Libberton*, 141 Ariz. 132, 139, 685 P.2d 1284, 1291 (1984)). We held that the fact the defendant was in the bank to commit a robbery "infect[ed] all other conduct." *LaGrand*, 153 Ariz. at 35, 734 P.2d at 577.

We agree with the trial court that the first murder was committed in expectation of pecuniary gain. The events leading to Cruz Ramos' murder began when Cook stole approximately $90 from Cruz Ramos' money pouch. Shortly thereafter, Cruz Ramos noticed his money pouch was missing. Cook told him to look upstairs in the bathroom, and then told him to look in Cook's bedroom. Once in Cook's bedroom, Cook pushed Cruz Ramos down on the bed. Matzke ripped up a couple of bed sheets, and together they tied up Cruz Ramos. Cook then hit Cruz Ramos in the face with his fists and asked him how much money he had. Cruz Ramos replied "about $90," and Cook took money out of his own pants pocket, said "$97," and threw the money on the ground. Cook and Matzke subsequently rummaged through Cruz Ramos' possessions to "see if he had anything else stashed." After Cruz Ramos got loose and tried to flee, Cook and Matzke caught him and bound him more securely. Events then escalated, concluding in Cruz Ramos' murder.

The causal link between the robbery and the murder is clear. Cruz Ramos was bound to a chair after discovering the robbery, both to keep him from escaping and to allow Cook and Matzke to determine whether he had anything else they could steal. When Cruz Ramos tried to escape, he was bound and tortured. When Cook and Matzke decided they could not let him go, he was finally killed. *Compare* cases

in which pecuniary gain was found: *State v. Marlow*, 163 Ariz. 65, 786 P.2d 395 (1989) (defendant kidnapped man who had been flashing money in Las Vegas, robbed him shortly after driving into Arizona, took him out of the car and kicked him over a cliff, then hit him on the head with a boulder); *State v. Rockwell*, 161 Ariz. 5, 775 P.2d 1069 (1989) (defendant robbed gas station and killed the attendant); *State v. Walton* 159 Ariz. 571, 769 P.2d 1017 (1989) (defendant and accomplices robbed victim in parking lot; defendant then took victim into the desert and shot him), *aff'd*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *State v. Stevens*, 158 Ariz. 595, 764 P.2d 724 (1988) (defendant robbed co-worker and another victim at gunpoint, then shot the latter); *State v. Nash*, 143 Ariz. 392, 405, 694 P.2d 222, 235 (defendant shot employee at coin shop, then stole $600; court found "plan to rob and a murder which furthered that plan"), *cert. denied*, 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985); *and State v. Hensley*, 142 Ariz. 598, 691 P.2d 689 (1984) (defendant made witnesses to bar robbery lie on the floor, then shot them); *with* cases where pecuniary gain was not established: *State v. Prince*, 160 Ariz. 268, 772 P.2d 1121 (1989) (defendant killed victim to whom he owed money from drug transactions, but evidence did not demonstrate beyond a reasonable doubt that he had killed victim to escape the debt); *State v. Wallace*, 151 Ariz. 362, 728 P.2d 232 (1986) (defendant killed his girlfriend and her children, then took $10 from her purse and went in her car to liquor store; court found taking of property to be incidental to the murder), *cert. denied*, 483 U.S. 1011, 107 S.Ct. 3243, 97 L.Ed.2d 748 (1987); *State v. James*, 141 Ariz. 141, 685 P.2d 1293 (court would not find pecuniary gain since jury had acquitted defendant on aggravated robbery and theft charges), *cert. denied*, 469 U.S. 990, 105 S.Ct. 398, 83 L.Ed.2d 332 (1984); *and State v. Gillies*, 135 Ariz. 500, 662 P.2d 1007 (1983) (defendant kidnapped and repeatedly raped victim, took her to her home and raped her again, and only then rifled through her possessions and took bank card and other valuables before killing her; court found

that evidence, including defendant's confession, indicated he killed her to eliminate her as witness to her own rape).

### c. Conviction on One Homicide Committed During the Commission of Another

▆ The trial court found as an aggravating circumstance that Cook had "been convicted of one or more other homicides, as defined in § 13–1101, which were committed during the commission of the offense." A.R.S. § 13–703(F)(8). Cook challenges this finding on two grounds. First, he argues that the trial court improperly considered this aggravating circumstance *sua sponte*. Second, he argues that, as a factual matter, the two homicides were unrelated and separated by several hours, and thus may not each be considered as "committed during the commission of the [other] offense."

On August 5, 1988, the prosecutor sent a sentencing memorandum to the court and to Cook. The sentencing hearing took place three days later. The prosecutor offered no new evidence at the sentencing hearing, but relied instead on evidence adduced at trial. Cook offered no rebuttal evidence other than a general statement of his innocence and the fact that he had not been charged or convicted of a felony or violent crime prior to his arrest on July 21, 1987. Cook added that the "[o]nly sentence I will accept from this Court at this time is the penalty of death." R.T. August 8, 1988, at 4.

The trial court noted at the sentencing hearing that the prosecutor had not discussed the applicability of the § 13–703(F)(8) aggravating circumstance in his sentencing memorandum. The judge asked the prosecutor whether he had simply overlooked that factor, or whether he felt that it did not apply to Cook's case. The prosecutor replied that "[i]t was simply overlooked." The court nevertheless found this aggravating circumstance to be present.

We have previously held that due process in a § 13–703 hearing requires that the prosecutor give defendant "(1) disclosure of the aggravating circumstances the state

will seek to prove; (2) disclosure of the evidence the state will use; and (3) disclosure sufficiently in advance of the hearing that the defendant will have a reasonable opportunity to prepare rebuttal." *State v. Ortiz,* 131 Ariz. 195, 207, 639 P.2d 1020, 1032, *cert. denied,* 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982). Even short notice may be timely where a defendant could have offered no rebuttal, did not ask for a continuance of the hearing, and was not prejudiced. *Id.* 131 Ariz. at 208, 639 P.2d at 1033 (two days' notice to defense sufficient for prosecutor to use defendant's concurrent conspiracy conviction as a § 13–703(F)(1) prior conviction).

Cook neither objected to the court's consideration of § 13–703(F)(8) nor requested a continuance. In addition, the fact of Cook's two murder convictions was evident from the verdict itself, so there was nothing for Cook to rebut. Under these circumstances, it is obvious that the prosecutor's failure to notify Cook about this aggravating circumstance did not prejudice Cook in any way.

■ Cook's contention that the two murders were not sufficiently factually related to establish the § 13–703(F)(8) aggravating factor is without merit. The two murders were committed during "a continuous course of criminal conduct." *Lavers,* 168 Ariz. at 394, 814 P.2d at 351. Swaney was detained because he had been shown the corpse of Cook and Matzke's first victim. He was then sodomized and murdered because Cook and Matzke decided they could not let him go after what he had seen. The trial court found that "even though there were perhaps a couple of

hours that separated the murders ... they were for all practical purposes committed at the same time and [in] one continuous course of conduct." R.T. August 8, 1988, at 15. We agree.[11]

### 2. *Mitigating Factors*

Cook offered no evidence in support of any mitigating factors to supplement the evidence already presented at trial. He requested only that the trial court consider the fact that he had never before been charged or convicted of a felony or violent crime. The trial court considered this evidence,[12] but found no mitigating circumstances. In coming to this conclusion, the trial judge stated that he had reviewed the presentence report, the Rule 11 reports,[13] the state's sentencing memorandum, all other matters that had been addressed, all hearings that had been held, a letter from Cook to the probation officer who prepared the presentence report, and the testimony at trial.

### a. Defendant's Intoxication and Mental History

■ Cook argues that the trial court's preclusion of evidence of intoxication at trial resulted in the court's rejection of intoxication as a mitigating factor. We have already explained that the preclusion applied only to the trial, and not to the sentencing hearing, and there is nothing in the record to indicate that Cook was misled to believe otherwise. The mere fact that Cook, who chose to represent himself, did not fully understand this distinction is not grounds for relief. We note again that

---

11. We acknowledge that the killings were not committed as part of a common scheme, nor did they arise out of a common intent to commit murder or out of a plan to eliminate witness who came upon the scene. Unlike what occurred in *Lavers,* the victims were not present together at the crime scene.

Nevertheless, even if Cook were correct that the homicides may not have been committed "during the commission of the offense," a different aggravating factor would be present. If the homicides were not simultaneous, then they were successive, and the aggravating factor in § 13–703(F)(1) would be present, at least with respect to the murder of Swaney. *See State v.*

*Smith,* 131 Ariz. 29, 30–31, 638 P.2d 696, 697–98 (1982) (defendant was convicted of two counts of first degree murder, and conviction on each count was used as an aggravating circumstance for the other count).

12. The trial judge found that given Cook's extensive history of misdemeanors, his lack of previous felonies or violent crimes was not a circumstance to be weighed in mitigation.

13. These reports were prepared in the course of determining that Cook was competent to stand trial, and consist of evaluations by mental health professionals. *See* Rule 11.

Cook did not present evidence of intoxication, nor of any other mitigating factor, at the sentencing hearing. Our review of the trial court's finding is therefore based on the evidence in the record before the trial court.

█ Cook also claims that the trial court erroneously refused to consider his history of mental problems as a mitigating circumstance. He states that the record contained undisputed facts and opinions regarding his psychological and neurological history that the trial court ignored.

Under § 13–703(G)(1), the sentencing judge must consider whether the "defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." The trial court acknowledged that there was some evidence of intoxication and drug use in the record, but that on the evidence before him, he did not feel justified in finding that Cook was under the influence of alcohol or drugs such that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law was affected.

The trial court also stated that it had considered Cook's history of mental problems evidenced by the Rule 11 examination reports and the presentence report. He further noted Cook's previous attempts at suicide. He concluded, however, that "I simply *do not find there to be any* connection between any of these prior mental problems and the offenses that were committed in this case." He added that Cook's impressive manner of conducting his criminal defense "reinforces my impression that whatever prior mental problems that the Defendant has had are in the past; that they did not directly impact upon the commission of these murders...." R.T. August 8, 1988, at 19–20.

The trial court's ruling that the evidence of intoxication and mental problems was insufficient to establish significant impairment of Cook's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law was based on the trial judge's assessment of the weight and credibility of the evidence before him. Consequently, we defer to his conclusion.[14] *State v. Fierro*, 166 Ariz. 539, 553, 804 P.2d 72, 86 (1990).

█ Our review, however, does not end here. We have previously held that even if the trial court does not find sufficient evidence to establish the § 13–703(G)(1) mitigating circumstance of "insufficient capacity," the court must further review all of the evidence for any independent mitigating effect that suggests in some way that the defendant be treated with leniency. *Fierro*, 166 Ariz. at 553, 804 P.2d at 86; *McMurtrey I*, 136 Ariz. at 102, 664 P.2d at 646.

We are satisfied from the record that the trial judge's consideration of the evidence of Cook's mental history was sufficient to have identified any independent mitigating circumstance weighing in favor of leniency. "The trial court is not required to find a mitigating circumstance; nor is it required to make a statement that none has been found. The trial court must, however, consider the evidence." *McMurtrey I*, 136 Ariz. at 102, 664 P.2d at 646. The record indicates that the trial judge did just that. Moreover, after conducting our independent review of the record, we do not believe that Cook's mental history demands or even justifies leniency, especially when balanced against the aggravating factors found to be present in this case.

b. Disparity with Codefendant's Sentence as Mitigation

█ Cook argues that the trial court erroneously failed to consider as a mitigating factor the fact that Cook's equally culpable codefendant received a twenty-year sentence as the result of a plea bargain. The state points out that the court did not

---

**14.** The most significant evidence of Cook's possible impairment is contained in the Rule 11 reports prepared by Daniel W. Wynkoop, Ed.D., and Eugene R. Almer, M.D. Their assessments of Cook's intoxication and its possible effects were based, however, on Cook's own statements, and the trial court was free to doubt the veracity of those statements.

consider this fact in mitigation because Cook never requested the trial court to do so. We note, however, that the trial judge stated in the record that he had considered "to some extent the proceedings as they relate to ... Mr. Matzke."

Cook is correct that, as a general matter, disparity in sentences is a relevant factor to be considered in weighing the appropriateness of the death penalty. In *Marlow,* the trial court sentenced the defendant to death, while his codefendant received a four-year prison sentence under a plea bargain; the trial court ruled that disparity in sentencing was not a mitigating factor to be balanced against aggravating factors. We disagreed, stating that

> [s]imply because an accomplice has received leniency does not in itself prevent the imposition of the death penalty. We appreciate the difficult tactical choices that must sometimes be made by the prosecution in obtaining a conviction. However, once that conviction has been obtained, disparity between the sentences of the sort that occurred in this case must be considered and may be found as a mitigating circumstance and weighed against any aggravating circumstances, in determining whether to impose the death penalty.

163 Ariz. at 72, 786 P.2d at 402 (citations omitted); *see also State v. Lambright,* 138 Ariz. 63, 76, 673 P.2d 1, 14 (1983), *cert. denied,* 469 U.S. 892, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984).

We believe that Matzke's twenty-year sentence is not so disproportionate to Cook's as to outweigh the aggravating circumstances present in this case. This is not a situation like that in *Lambright,* in which a "codefendant" was granted immunity from prosecution in return for her testimony, and so served not a single day in jail despite the trial judge's conclusion that she was as guilty as the other defendants who received death sentences. 138 Ariz. at 76, 673 P.2d at 14. Nor is this case like *Marlow,* in which the probation officer who prepared the presentence report testified that she considered the codefendant's four-

year prison sentence a "travesty of justice." 163 Ariz. at 71, 786 P.2d at 401.

### 3. *Disposition of Aggravation/Mitigation Findings*

We have reviewed the record for evidence of aggravating circumstances and mitigating factors. We agree with the trial court that the state has established the existence of the aggravating factors beyond a reasonable doubt. We also agree with the trial court's finding that there is insufficient evidence to establish any of the statutory mitigating factors. We find no evidence supporting any independent mitigating factor warranting leniency. Because the aggravating factors outweigh the mitigating circumstances, we find that the trial court correctly imposed the death sentences.

### B. Proportionality Review

We must also conduct a proportionality review to determine whether imposition of the death penalty in this case violates the eighth amendment. The issue is whether the death penalty imposed upon this defendant is excessive or disproportionate to the penalty imposed on defendants in other cases. *State v. Roscoe,* 145 Ariz. 212, 227, 700 P.2d 1312, 1327, *cert. denied,* 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 525 (1985). We have reviewed our other cases and find that Cook's death sentence is not disproportionate. The facts of this case require no further elaboration. *See id.* (egregiousness of facts obviated need for extensive proportionality review).

### CONCLUSION

We have examined the record for fundamental error pursuant to A.R.S. § 13–4035, and have found none. For the reasons detailed above, we affirm Cook's convictions and sentences.

GORDON, C.J., and CAMERON, J., concur.

MOELLER, Justice, specially concurring in part.

I agree with all portions of the majority's opinion except the portion entitled "Proportionality Review." For reasons which have previously been stated, I do not believe this court should be engaging in proportionality reviews. *See State v. White,* 168 Ariz. 500, 815 P.2d 869 (1991); *State v. Greenway,* 170 Ariz. 155, 823 P.2d 22 (1991).

CORCORAN, Justice, specially concurring in part.

I join in Justice Moeller's special concurrence.